STATE of Tennessee, upon the relation of William M. LEECH, Jr., Attorney General, and upon the relation of thirteen citizens of Lincoln County, Tennessee, Plaintiffs-Appellants,

v.

Grady WRIGHT, Road Superintendent for Lincoln County, Tennessee, Defendant-Appellee.

Supreme Court of Tennessee.

Oct. 26, 1981.

W. Howell Forrester Wade, Forrester, Hays & Wallace, Pulaski, William M. Leech, Jr., Atty. Gen., Michael E. Terry, Deputy Atty. Gen., Nashville, for plaintiffs-appellants.

Don Wyatt, Fred I. Womack, Womack & Mason, Fayetteville, for defendant-appellee.

## OPINION

FONES, Justice.

Plaintiffs, eleven citizens of Lincoln County and the State Attorney General, appeal from an adverse decree of the trial court, following a non-jury trial of this suit brought to oust defendant, Grady Wright, from the office of Road Superintendent of Lincoln County.

The thrust of plaintiffs' appeal is that the proof adduced at trial required a finding of wilful misconduct in office, and, that the trial judge made a number of erroneous rulings that had the effect of limiting their discovery and proof at trial; that plaintiffs are entitled to a judgment of ouster by this Court, or in the alternative, a new trial.

## I.

Plaintiffs filed suit on April 8, 1980, alleging that defendant's wilful misconduct in office consisted of (1) failure to obtain competitive bids before purchasing materials, supplies, and equipment; (2) that he knowingly permitted county equipment, materials and supplies to be used by private individuals for private purposes in violation of T.C.A. § 54–7–202, that makes such an act by a county road superintendent a misdemeanor subject to fine or imprisonment or both; (3) that defendant permitted county employees to work for private individuals for private purposes during the same hours they were being paid by Lincoln County; (4) that the defendant misused county employees to dispense personal favors, illegally improve private property and for his own personal benefit; (5) that he used his office to discriminate against citizens who did not politically support him; and (6) that he did not maintain adequate records.

On April 14, 1980, defendant moved for a more definite statement which motion was granted on April 17, allowing plaintiffs until April 28, to amend and defendant until May 18, to respond. Plaintiffs filed their amended complaint on April 28, and defendant answered on May 16. Defendant's answer included nine separate instances wherein portions of the amended complaint were said to be vague or lacking in specificity and moved that those portions be stricken. The Court also required that the parties formulate jury issues by July 3, and the case was set for trial on July 9.

On July 27, 1980, plaintiffs took the discovery depositions of Grady Wright and Tommy Wright. Plaintiffs contend that they sought to take the depositions earlier but that defendant claimed unavailability. At that deposition plaintiffs' counsel had a list of more than one hundred county warrants issued in payment of purchases by the Lincoln County Highway Department in excess of fifteen hundred dollars. When questions were asked of defendant regarding the bid procedures followed in making some of those purchases, defendant's counsel asked that the list be submitted, impliedly for the defendant to search his records and prepare for further questioning. Plaintiffs' lawyers deferred to that request, revised the list to contain one hundred twelve warrants and delivered it to defendant's counsel on June 30, 1980, with a set of questions applicable to each warrant. At the pre-trial conference on July 3, the trial judge sustained defendant's motion for a protective order relieving him from answering any questions with respect to one hundred ten of the warrants. He ruled that plaintiffs could examine defendant on two of the warrants because they had been referred to in a subpoena duces tecum issued on the day suit was filed April 8, 1980. After the trial judge's adverse ruling, plaintiffs reduced the list of warrants to thirty-four and sought reconsideration of the court's holding at the July 3 conference and at trial on July 9, without success.

During the discovery deposition of Tommy Wright, defendant Grady Wright's counsel advised Tommy Wright not to answer questions relating to Tommy Wright's acquisition of the Wright Paving Company from his father on August 30, 1974, prior to his first term as county road superintendent, which began on September 1, 1974. Also, the son was advised not to answer questions about certain county employees working for him when on the county payroll and his paving company obtaining steel from county bridges. On July 3 and July 9, the trial judge sustained the actions of defendant's counsel and refused to allow plaintiffs to question Tommy Wright with regard to those matters. However, the trial judge allowed plaintiffs to question witnesses at the trial with respect to Robert B. Bradford and Irvin Massey working for the Wright Paving Company while on the county payroll, apparently because plaintiffs had alleged in the amended bill filed on April 28, that those two employees worked for the county and Tommy Wright at the same time. The trial judge expressly declined to allow plaintiffs to amend on July 3, or at trial, to include the names of John Hobbs, Larry Sandlin, Robert Koonce, Jessie Randolph, Luther Hopkins, Jim Flint, Jack

Sandlin and Bobby Joe Bartlett as county employees who had worked for Tommy Wright during the same hours that they were being paid by Lincoln County at times during the current term of defendant's office which began September 1, 1978.

A pre-trial conference was held on July 3, 1980. Defendant withdrew his jury demand and the Court proceeded with a consideration of the nine instances recited in defendant's answer wherein defendant sought to strike allegations in the plaintiffs' amended complaint because of alleged lack of specificity, heard plaintiffs' motions to amend and to require further discovery of Tommy Wright and Grady Wright, refused or deferred at the June 27 depositions.

The July 3 pre-trial conference was not transcribed and we do not know what evidence or argument was presented by defendant in support of his motion to suppress discovery or trial testimony with respect to the one hundred ten warrants or the reduced number of thirty-four.

It was the contention of defendant that the rules of civil procedure had no application to an ouster suit and apparently that position was accepted by the trial judge at the time he ruled that Tommy Wright need not answer with respect to the matters mentioned hereinabove.

 The trial judge was in error in limiting the discovery deposition of Tommy Wright to matters specifically alleged in the amended complaint and in refusing to allow an amendment adding eight employees alleged to have been on the payroll of Wright Paving Company and Lincoln County at the same time. The defendant's contention that the Tennessee Rules of Civil Procedure do not apply because the ouster statutes create a sui generis action that is quasi criminal in character is without merit.

In *State ex rel. Thompson v. Crump*, 134 Tenn. 121, 183 S.W. 505 (1916), the Court in responding to arguments of defendants who had been ousted from office that Article 5, Section 5 of the Tennessee Constitution provided the exclusive method of removal of civil officers, made these comments about the ouster act:

"Inasmuch therefore, as the constitution has not undertaken to regulate proceedings for the removal of officers when such proceedings are civil in character, it follows that it was competent for the legislature to formulate a scheme of its own.

As observed in *State ex rel. v. Howse*, 132 Tenn., 452, 178 S.W. 1110, ouster proceedings are civil in their nature. Such is the weight of authority. See cases collected in note to *Territory v. Sanches*, 20 Ann.Cas., 112.

Section 5, of article 5 relates alone to criminal proceedings against the officers therein named. No civil remedy is suggested. The matter of civil procedure is left entirely open.

We have a number of cases sustaining the removal of officers by civil procedure, where such officers have been guilty of offenses punishable by indictment and criminal prosecution. In such civil proceedings the defendant is not entitled to the constitutional rights he might demand in a criminal prosecution. These civil proceedings are merely collateral to criminal proceedings which result incidentally upon conviction in a judgment of removal. *Sevier v. Justices*, 7 Tenn. (Peck), [334] 335; *Tipton v. Harris*, 7 Tenn. (Peck), 414; *Fields v. State*, 8 Tenn. (Mart. & Y.), 168." *Id.* at 141–42, 183 S.W. 505.

All civil actions in this State are governed by the Tennessee Rules of Civil Procedure. *See* T.R.C.P. 1 and *Tennessee Department of Human Services v. Vaughn*, 595 S.W.2d 62 (Tenn.1980).

T.C.A § 8–47–115 provides in part that, "... all questions as to the sufficiency of the petition or complaint shall be raised and determined upon the trial of the case, and if such petition or complaint is held to be insufficient in form, the same shall be amended at once and such amendment shall not delay trial of the case."

 We have no hesitancy in holding that if there is any conflict between any express provision of the ouster statutes and

the Tennessee Rules of Civil Procedure, the ouster statute should prevail. The ouster act provides that if the complaint is insufficient in form it *shall* be amended at once but it does not expressly deal with amendments that involve substance and therefore such amendments are governed by the Tennessee Rules of Civil Procedure. The following portion of Rule 15.02 governs the factual situation involved here and reads as follows:

"If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

We agree with defendant's contention that the legislative intent evident in the ouster act was to provide a speedy summary proceeding and that continuances by agreement of the parties are expressly prohibited. But, T.C.A. § 8–47–119(b) expressly authorizes continuances for good cause shown, which is consistent with T.R.C.P. 15.02, expressly authorizing a continuance where the party objecting to an amendment shows prejudice to the maintenance of his action or defense.

■ In our opinion, the ouster statutes do not support the action of the learned trial judge in denying the amendment sought by plaintiffs on July 3, 1980. The trial was set for July 9, six days later, and in fact, the trial of this case was not concluded until July 17, two weeks later. There is no evidence in this record to support a finding that defendant would have been prejudiced or would have required a continuance if the amendments sought by plaintiffs had been allowed. The amendments sought did not raise any new issues, merely additional instances wherein defendant had not followed competitive bidding

procedures and had allowed additional instances of county employees working for his son's company while on the county payroll and other informal dealings of his son's company with county materials and supplies.

■ Defendant was first elected Lincoln County Road Superintendent for a four year term in 1974 and took office on September 1, 1974. In 1978 he was re-elected for a four year term beginning September 1, 1978. Only acts committed in the term beginning September 1, 1978, can be used in this suit to oust him from office for the remainder of the current term. *See State ex rel Chitwood v. Murley*, 202 Tenn. 637, 308 S.W.2d 405 (1957); and *State ex rel Thompson v. Crump*, 134 Tenn. 121, 183 S.W. 505 (1916).

Prior to his election in 1974 defendant was engaged in business as a paving contractor and had brought his son into the business as a partner. On August 30, 1974, he executed an instrument conveying his "one-half undivided interest in the business known as Grady Wright Paving Company" to his son Tommy Wright. Since that time Tommy Wright has incorporated the business and its name was changed to Wright Paving Company. According to the evidence in this record, Tommy Wright owns all of the stock in the corporation. It appears that the paving company is operated from the premises of Tommy Wright's home which adjoins defendant's residence, all located on defendant's farm.

■ Plaintiffs contend that defendant continues to have a financial interest in Wright Paving Company. We find no evidence in the record to support that contention. However, as will hereinafter appear, there was clear and convincing evidence adduced that defendant knowingly and wilfully permitted Lincoln County equipment to be used by Wright Paving Company in violation of T.C.A. § 54–7–202 and knowingly and wilfully permitted a county employee to work for Wright Paving Company at the same time that the was being paid by Lincoln County. Those acts together with

his failure to comply with his legal duty to purchase and contract for items in excess of fifteen hundred dollars upon competitive bids require that we enter a judgment of ouster. It is therefore unnecessary that we decide whether the errors of the trial judge were prejudicial, entitling plaintiffs to a new trial.

## II.

With regard to competitive bids on purchases made by defendant as the Lincoln County Road Superintendent, he was governed by chapter 114 of the Private Acts of 1951 which was amended effective July 1, 1979, by chapter 45 of the Private Acts of 1979. The amendment excluded purchases under $1,500 whereas the 1951 Act excluded purchases under $500. The Private Act as amended reads as follows:

"Section 11. Be it further enacted, That the road superintendent shall have authority to purchase such equipment as he deemed necessary to be used in the building and maintenance of the roads and highways of Lincoln County and such equipment shall be paid for out of any road funds available to such county. Provided that any single purchase of an item of equipment of any character as well as gas and other supplies shall be made by the road superintendent and the county executive jointly upon competitive bids when such single item or single purchase is contemplated to exceed one thousand five hundred dollars ($1,500.00). When the road superintendent purchases more than one item of the same kind that individually does not exceed one thousand five hundred dollars ($1,500.00) in any twelve (12) months, such superintendent shall take competitive bids for such items annually and shall purchase the items in quantity rather than singly. In all purchases for which competitive bids are taken, such purchases shall be made in such quantities, if more than one is needed, as will give the county the benefit of the best possible prices. Except as otherwise provided by this section, the road superintendent shall have the right to make all necessary purchases of supplies, materi-

als, and equipment when the costs of any such single purchase doe not exceed one thousand five hundred dollars ($1,500.00) without competitive bids and without the approval of the county legislative body. All purchases shall be paid for out of the road fund by warrant issued by the superintendent and countersigned by the county executive."

The trial judge's findings included the following:

"He (defendant) testified that competitive bidding in his mind meant buying something at the cheapest price. He testified that sometimes he solicited bids by letter, sometimes by telephone, and sometimes in person and that in most cases he asked the bidder to write him a letter which is put in a bid file.

He states that on some occasions bids are submitted in person and he receives various solicited and unsolicited price lists on various products."

Defendant's brief in this Court accurately states a significant portion of defendant's testimony with respect to his understanding, practices and procedure with respect to competitive bids:

"In answer to what he considered to be a bid, Grady Wright replied, 'I constitute a bid as getting something at the cheapest price ... why advertise in the newspaper for a bid for something ... if there is no place around here that sells that. Why do you want to keep a newspaper up?' Most of the time Mr. Wright telephones places where he feels that the needs of the Lincoln County Highway Department can be filled. If they can't, he asks them to mail him a letter to that effect; otherwise, he invites their bids. (T.P. pgs. 383, 394)

He does not advertise in local newspapers unless he knows that the material or equipment can be furnished locally. (T.P. pg. 395)

Many times the bookkeeper, Mr. Frank Locker, will invite bids in person by visiting various business establishments or by telephone. There is no particular form

for bids. Mr. Wright knows of no law which requires written invitation for bids. (T.P. pg. 395) Under cross examination the question was put to Mr. Wright, 'Mr. Wright, to the best of your judgment and the best of your belief, have you taken bids according to what you conceive to be the law? Have you done it according to the law as you understand it?' Answer, 'Yes, sir.' (T.P. pg. 397)

Mr. Wright testified that he could not define the word 'bid' from the definition in the Webster's Dictionary, but to him it is 'anything that is offered for sale with a price on it.' (T.P. pg. 822)"

Upon cross examination, defendant Grady Wright testified as follows:

"Q. Okay, Mr. Wright, you say when you are getting ready to buy something, that you call around when you are looking for bids, is that right?

A. It depends on what I am buying.

Q. Would you describe a price list as a bid? Are they the same things in your mind?

A. Mr. Terry, I looked up in the Webster's Dictionary what is a bid. That's about, to go back, what is a county road. If you can tell me what a county road is, I might tell you what a bid is.

Q. Mr. Wright, are you saying that you don't know what a bid is?

A. By Webster's Dictionary, no, sir, I don't. What I call a bid, Mr. Terry, is anything that is offered for sale with a price on it.

Q. A price on anything that is offered for sale is a bid?

A. We are going to go right back to your tires now. If a sheet of paper is on there and different size tires are on there and a price at the end of it what each one costs I call that a bid.

. . . .

Q. But during the years since then, have you ever been to the county attorney and asked him about bids, what a bid is?

A. I have been to the county attorney, I guess, on the average of once or twice a week since I have been in office.

Q. Did he ever tell you what a bid is?

A. I don't know if I can answer that, Mr. Terry. I don't remember.

Q. Did you ever talk to Mr. Locker about bids?

A. We talked about bids a whole lot, yes, sir.

Q. Mr. Locker is your bookkeeper?

A. That's correct.

Q. Do you know his background, his educational background, as far as accounting, did he have any experience in that area?

A. Yes, sir. He was the main bookkeeper at De Lap's Gin at Vann Town I don't know how many years, he was a bookkeeper at CFW Construction Company here in Fayetteville, he worked there for a while, and that's the only two places I know that he worked as bookkeeper now.

Q. Did he ever describe a bid to you, tell you what a bid is? Did you ever talk to him about bidding procedures?

A. Yes, sir. We have discussed it.

Q. And what you have done as a result of those discussions?

A. Yes, sir.

Q. Let me understand this. According to your understanding there is no difference between a price list and a bid?

A. No sir. Not in my category. Anything that is offered for sale and you get a price on the end of it, what they would sell it for, according to me, that's a bid.

Q. What's the purpose for a bid, Mr. Wright?

A. The lowest price.

Q. The lowest price?

A. And best price.

Q. How do you get the lowest price and best price?

A. If they send you a list down that's what they are offering to sell that for.

Q. No, Mr. Wright, that's what they are offering to sell it to the general public for, isn't it? That's what they will sell it to anybody who walks in their store for, isn't it?

A. Yes, sir."

Joe Kimery, an auditor with the State Comptroller's Office, testified that he performed an audit of the office of Lincoln County Road Superintendent for the period July 1, 1978 to June 30, 1979, and that on September 14, 1979, he personally delivered to and discussed with defendant the following written finding and recommendation:

"3. *Finding*:

The roads purchasing procedures are governed by chapter 114, Private Acts of 1951 as amended. Purchases in excess of five hundred dollars shall be made jointly by the road superintendent and the county judge on a competitive bid basis. The county judge is not actively involved on any of the road department's purchases.

*Recommendation*:

Bid invitations on purchases expected to exceed fifteen hundred dollars (beginning July 1, 1979) should be solicited by the road superintendent by newspaper advertisement and/or direct letters. All bid invitations should instruct the bidder to send their reply directly to the county judge's office. These sealed bids will be opened at the judge's office by the county judge and road superintendent at a predetermined date and time. Copies of all bids received, bids requested, and other pertinent information should be filed by the fiscal year in which the item was purchased. Emphasis should be placed on obtaining bids on as many items as possible from as many sources as possible."

■ The trial judge erroneously rejected this evidence on the grounds that the "recommendation" was not admissible. In his memorandum opinion he commented as follows:

"It should be pointed out here that the Private Act does not define 'competitive bidding' nor does it provide for the method or procedures for obtaining same except that the superintendent and county executive shall make such purchases jointly upon competitive bids. There is no allegation in the complaint that such purchases were not made jointly with the county executive."

Implicitly the trial judge gave no significance whatever to the auditor's finding and recommendation. It is true that the private act applicable to the Lincoln County Road Superintendent does not define competitive bidding but we hold that competitive bidding has a legal meaning and that the legislative act imposing upon the defendant the obligation to make purchases jointly with the county executive on competitive bidding requires that the minimum standards of competitive bidding be followed. On the evidentiary question of the admissibility of the finding of the auditor that the county judge was not actively involved in any of the road department purchases, the defendant's own testimony clearly establishes that fact and the auditor's finding was merely cumulative. With respect to the admissibility of the recommendation the defendant's position was that he was entitled to place his own interpretation upon what constituted competitive bidding and that his sources were his bookkeeper and the dictionary. Under well established principles of evidence it was certainly material for the plaintiffs to show, as they did without objection, that he had owned his own paving company and made bids in competition with other firms and to show what the state auditor recommended as a method of complying with the private act that mandated purchases exceeding fifteen hundred dollars be made jointly with the county executive upon competitive bids.

In *Wilmington Parking Authority v. Ranken*, 34 Del.Ch. 439, 105 A.2d 614 (1954), one of the issues before the Supreme Court of Delaware was whether the Wilmington

Parking Authority, in entering into a lease agreement, had complied with a statute requiring that, "any such lease shall be granted on a fair, competitive basis." *Id.* 105 A.2d at 630. That Court made the following observations which we think are particularly applicable to the instant case:

"The statute contains no specification of the procedure to be followed to insure competition in connection with the granting of leases. But the import of the phrase, 'a fair competitive basis', is clear. There must be compliance with the minimum requirements of competitive bidding. Such requirements in connection with the letting of public contracts are deeply imbedded in American statutory law. Apart from special statutes, there are certain well settled principles by which the courts test the acts of public officers in letting public contracts under laws requiring competitive bidding." *Id.* 105 A.2d at 630.

The opinion of the Supreme Court of Delaware includes a number of quotes from other authorities commenting upon the requirements to be met by public bodies and public officials charged with purchasing and contracting upon competitive bids. We expressly approve the following:

"The request for bids must not unduly restrict competition. All persons or corporations having the ability to furnish the supplies or materials needed, or to perform the work to be done, should be allowed to compete freely without any unreasonable restrictions." 10 McQuillin, Municipal Corporations § 29.44, pg. 294.

"In order to attain competitive bidding in its true sense, proposals for bids must be invited under fair circumstances which afford a fair and reasonable opportunity for competition. Consequently, it is essential that the bidders, so far as possible, be put on terms of perfect equality, so that they, may bid on substantially the same proposition, and on the same terms." 10 McQuillin, Municipal Corporations § 29.52, pg. 312.

" 'Competitive bidding' requires due advertisement, giving opportunity to bid and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the proposal specify as to all bids the same, or substantially similar specifications." *Sterrett v. Bell*, 240 S.W.2d 516, 520 (Tex.Civ.App.1951).

Substantially similar definitions of competitive bidding appear in *Flynn Construction Co. v. Leininger*, 257 P. 374, 378, 125 Okl. 197 (1927); and *State Highway Commission of Kentucky v. King*, 82 S.W.2d 443, 450, 259 Ky. 414 (1935).

Although it does not appear in this record that Lincoln County's legislative body has adopted the County Purchasing Law of 1957, T.C.A. § 5–14–101 et seq., that Act contains what the Legislature of this State clearly regards as the essentials of competitive bidding applicable to county governing entities and county officials. T.C.A. § 5–14–108.

Thus, we hold that the minimum requirements for complying with the private act applicable to defendant are as follows: notification to interested bidders by a method designed to reach bidders likely to be interested, either by direct mail, newspaper advertising, posting of notices in public places or any combination thereof, such notification to contain substantially the following information: (1) specification of the supplies or equipment to be purchased and the quantity thereof; (2) the time or timeframe for delivery if relevant; (3) the deadline for submitting bids addressed to the county executive and the county road superintendent jointly and the address of the office to which the bids should be submitted; (4) the time and place that the bids would be opened jointly by the county executive and the road superintendent.

In February 1980, defendant purchased two trucks from Rambo Motor Company,

the Chevrolet dealer in Fayetteville. Defendant produced two letters one from a Huntsville, Alabama Ford dealer, another from a GMC dealer, both saying that they did not have any used tri-axle dump trucks and therefore declined to bid. Defendant testified that he then went to Rambo and began negotiating for two tri-axle dump trucks that he had had his eye on for some time and was successful in obtaining them for $11,000, although Rambo's original asking price was $14,000. That transaction, occurring after the State auditor put defendant upon notice of some of the basic requirements of competitive bidding, conclusively establishes that he wilfully ignored his duty to make purchases upon competitive bidding. This record establishes by the defendant's own testimony that he never at any time complied with the minimum standards of competitive bidding in making the many purchases that he has made as county road superintendent during his present term of office which began on September 1, 1978.

In July 1979, Lincoln County paid Shelby Contracting Company of Huntsville, Alabama $78,745.67 for 4,712.774 tons of hot asphalt and for hauling and spreading it on the road between the towns of Cold Water and Taft in Lincoln County. Shelby Contracting Company submitted a unit price bid to defendant dated July 7, 1978, of $15.00 per ton for the asphalt, F.O.B. its plant in Huntsville, Alabama, $2.00 per ton for hauling to the job site and $1.00 per ton for laying the asphalt. Defendant testified that his file contained another bid made by Hawkins Paving Company of Huntsville, Alabama, dated July 6, 1978. The Hawkins bid quoted $16.10 per ton for the hot asphalt material, $3.00 per ton for hauling it and $2.00 per ton for laying the asphalt. Defendant could not recall having solicited the Hawkins bid nor how or when it was received. On cross examination he said it might have "jumped in the file." Hawkins' deposition was taken by plaintiffs and introduced into evidence. He testified that Mr. Chesser, owner of Shelby Contracting Company, told him that he had a job, "already sewed up," and needed a complimentary bid; that he asked Hawkins to give him one of his proposal forms signed and Chesser would fill in the form. Hawkins testified that he complied with Chesser's request and at the deposition identified his company's bid in defendant's file as the one signed by him and turned over to Chesser. Chesser testified by deposition and denied that he obtained a complimentary bid from Hawkins or that he had any knowledge that Hawkins had submitted a bid to defendant.

Tommy Wright's paving company hauled one thousand tons of the asphalt from Shelby's plant to the job site and laid all 4,712.-774 tons with its spreader, and was paid the same unit prices as Shelby's bid to Lincoln County, that is, $2,000 for hauling 1,000 tons and $4,712.77 for laying all of the asphalt purchased for the job. Shelby Construction Company hauled 670.64 tons and the balance of 3,042.113 tons was hauled by trucks owned by Lincoln County. Tommy Wright and Chesser testified that Wright Paving Company had an oral sub-contract with Shelby Construction Company that was not suggested or arranged by defendant. The trial judge excluded from consideration an identical arrangement between Lincoln County, Shelby Construction Company and Wright Paving Company where the Lincoln-Vann Town job was performed with Lincoln County paying Shelby Construction Company $115,099.74 and Shelby paid Wright Paving Company $9,941.24 for the hauling and spreading performed by Wright Paving Company.

There was also evidence that defendant purchased tires from Brad Ragan, Inc., a Nashville tire dealer, between August 1978 and December 1979, in a sum approximating $27,000, without following the minimum requirements for competitive bidding. Defendant testified that Ragan gave good service in changing tires on large equipment and had "odd-ball" sizes that the Lincoln County Equipment called for, not carried by other tire dealers in the area. Neither those circumstances nor any other circumstances can relieve public bodies or public officials from the requirement of following the minimum procedures for obtaining com-

petitive bids when the law imposes that obligation. In the instance of the Rambo purchase, the Cold Water-Taft project and the tire purchases from Ragan, the evidence is clear and convincing that defendant failed to follow minimum requirements of competitive bidding.

### III.

Tommy Wright admitted that Wright Paving Company used a yellow steel-wheel roller that belonged to Lincoln County on at least three jobs being performed by Wright Paving Company. The jobs were identified as Jack Daniels Distillery, Cook's Pest Control in Shelbyville, and a parking lot in Marshall County. Tommy Wright testified that defendant, his father, gave him permission to use the roller and that he more than paid the county for its use by lending to Lincoln County from time-to-time, various pieces of equipment belonging to Wright Paving Company. It would serve no purpose to chronicle the testimony of defendant, Tommy Wright and others about the practice of swapping equipment between Lincoln County and Wright Paving Company. Suffice it to say that no records of any kind or character were kept by either party and the "off-the-cuff" testimony of the witnesses at trial attempting to estimate the time of use by each party and the estimates of rental value of the equipment involved in the swaps between the two parties had no probative value whatsoever.

T.C.A. § 54–7–202 provides in pertinent part as follows:

> *Private use of equipment and materials prohibited—Penalty—Work for governmental entities authorized.*—The chief administrative officer shall not authorize nor knowingly permit the trucks or road equipment, the rock, crushed stone or any other road materials to be used for any private use or for the use of any individual for private purposes and his failure to see that this provision is enforced is a misdemeanor, punishable by a fine of not less than five dollars ($5.00) nor more than fifty dollars ($50.00) or confinement in the county jail for a period of not less than ten (10) days nor more than thirty (30) days or both in the discretion of the court.

T.C.A. § 54–7–103 defines "chief administrative officer" as "a county road superintendent." The statute then provides that county governmental bodies may authorize the county road department to perform work for other governmental entities provided the road department is reimbursed. The trial judge's memorandum opinion indicates that he interpreted the statute as allowing private use of county equipment if the county was compensated and he made a general observation indicating he thought the county got the best of the equipment swapping transactions and therefore concluded defendant was not guilty of any wilful misconduct in violation of the statute.

We disagree. We think the evidence is clear and convincing that defendant knowingly violated T.C.A. § 54–7–202 by permitting his son to use the steel-wheel roller for the benefit of Wright Paving Company. The statute prohibits private use unequivocally, without mention of compensation and it follows that such use violates the statute, with or without compensation.

In *Jordan v. State*, 217 Tenn. 307, 397 S.W.2d 383 (1965), this Court approved the following definition of knowingly and wilfully as used in the ouster statutes:

> "The words 'knowingly and willfully' also are not confined to a studied or deliberate intent to go beyond the bounds of the law but also encompass a mental attitude of indifference to consequences or failure to take advantage of means of knowledge of the rights, duties or powers of a public officer [sic] holder." *Id.* at 398, 397 S.W.2d 383.

Defendant admitted that the county attorney was available to advise him at any time and that he consulted him almost weekly. Defendant did not assert ignorance of the statute prohibiting private use of county equipment and the conclusion that he acted with conscious indifference to the consequences and therefore knowingly and wilfully is inescapable.

## IV.

Robert Bradford was a full time employee of the Lincoln County Highway Department whose job title was heavy equipment operator. He testified that his salary was $125 per week for a forty hour week; that the county did not pay for overtime, but if he worked on Saturday he was paid the regular rate of $25 per day. Plaintiff sought to prove that in September, October, November and up to December 21, 1978, Bradford worked for Wright Paving Company, on numerous occasions, at the same time he was being paid to work for Lincoln County. The County payroll record introduced reflected that Bradford was paid his full salary for those four months plus an extra day, presumably a Saturday, in September, October and November. Testimony and exhibits also established that Wright Paving Company paid Bradford by check a total of $227.17 in September, $112.69 in October, $199.64 in November and $256.24 in December, not including a $50 Christmas bonus. There was also evidence that Irvin Massey worked for Wright Paving Company at times when he presumably was being paid by Lincoln County but that evidence was somewhat vague and will not be detailed. As stated heretofore, plaintiffs were erroneously foreclosed by the trial judge from adducing any proof with respect to eight other employees said to have worked for Wright Paving Company while on the county payroll.

Bradford was a reluctant witness called by the plaintiffs who readily admitted his friendship with Grady and Tommy Wright. He insisted that he did not know the hourly or daily rate that he was paid when working for Wright Paving Company. He said he left it up to Tommy Wright. If Wright Paving Company paid him the same rate as Lincoln County, and there is no evidence to the contrary, he worked for that company nine days in September, four and one-half days in October, almost eight days in November, and ten days in December or a total of thirty-one and one-half days. No one produced any records that reflected the dates Bradford performed work and the witnesses professed a complete inability to recall the dates with one exception. Bradford testified unequivocally at page 281 in the transcript that he operated the county's yellow steel-wheel roller on the Wright Paving Company parking lot job in Marshall County for two week days in October of 1978. The records make it unmistakably clear that he was also paid by the county on all week days in October, 1978. Also, it is clear that excluding the three Saturdays that the county paid Bradford, there were not enough Saturdays and Sundays between September 1 and December 21, 1978, to enable Bradford to work thirty-one and one-half days for Wright Paving Company and not duplicate time during which he was being paid by the county. Bradford also testified that any time he worked for Wright Paving Company he had Grady Wright's permission to do so.

It was defendant's contention that allowing county employees to work for and be paid by Wright Paving Company while on county payroll was justified because those employees put in overtime for the county for which they were not compensated. No attempt was made to document how much overtime Bradford or Massey or any other county employee worked for the county and the conclusion of the trial judge that "they gave the county more time than they were paid for" was not supported by any credible evidence whatsoever. It is patently intolerable and clearly unlawful and an inexcusable dereliction of duty for a public official to allow public employees to work for private employers while being paid from the public treasury.

## V.

■ Our review of the findings of fact by the trial court in this non-jury civil action on direct appeal is de novo, accompanied by a presumption of correctness of the finding unless the preponderance of the evidence is otherwise.

■ We affirm prior case law holding that ouster proceedings should not be brought unless there is a clear case of official dereliction. *See State ex rel Wilson v.*

*Bush,* 141 Tenn. 229, 208 S.W. 607 (1919), and *McDonald v. Brooks,* 215 Tenn. 535, 387 S.W.2d 803 (1965). As heretofore indicated, we find that defendant has clearly, knowingly, wilfully and continuously violated the competitive bidding requirements of the private act that established the office he holds, similarly violated T.C.A. § 54–7–202 and knowingly and wilfully allowed Bradford to work for Wright Paving Company while being paid by Lincoln County. Those derelictions are at least comparable to, if not more serious than those held to justify ouster in *State ex rel Milligan v. Jones,* 143 Tenn. 575, 224 S.W. 1041 (1920); *State v. Smith,* 158 Tenn. 26, 11 S.W.2d 897 (1928); and *Jordan v. State, supra.*

The judgment of the trial court is reversed and this case remanded for the entry of a judgment of ouster, and a declaration of vacancy in the office of Road Superintendent of Lincoln County, to be filled according to law in such cases. Costs are adjudged against defendant.

HARBISON, C. J., and COOPER, BROCK and DROWOTA, JJ., concur.