**METROPOLITAN AIR RESEARCH TESTING AUTHORITY, INC., Plaintiff/Appellant,**

v.

**The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY; the Metropolitan Department of Finance and Its Division of Purchases; the Standards and Specifications Committee of the Metropolitan Government; the Metropolitan Department of Health; Everett Medlin; Purchasing Agent for the Division of Purchases of the Metropolitan Government; and Hamilton Test Systems, Inc., Defendants/Appellees.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

July 8, 1992.

Permission to Appeal Denied by Supreme Court Nov. 30, 1992.

Thomas V. White, Tune, Entrekin & White, Ben C. Fordham, Harwell, Martin & Stegall, Nashville, for plaintiff/appellant.

John L. Kennedy, Metropolitan Atty., Nashville, for Metropolitan Government.

E. Clifton Knowles, Bass, Berry & Sims, Nashville, for Hamilton Test Systems, Inc.

## OPINION

KOCH, Judge.

This appeal arises from a dispute concerning the award of the contract for Nashville's vehicle inspection maintenance program. After the city awarded the contract to a new vendor, the former vendor filed an action in the Chancery Court for Davidson County asserting that the contract should be set aside because the new vendor's proposal did not meet the bid specifications and because the city's procurement process violated the Sunshine Law. The trial court dismissed the complaint after finding that the city did not violate the Sunshine Law and that the former vendor lacked standing to challenge the contract's compliance with competitive requirements. While we concur with the dismissal of the Sunshine Law claim, we find that the former vendor had standing to challenge the award of the contract. We also find that the city is entitled to a summary judgment dismissing the former vendor's claims on the merits.

### I.

Over a decade ago, the Environmental Protection Agency determined that Nashville's air quality exceeded the Clean Air Act's maximum ambient air quality standards for carbon monoxide and ozone. After the EPA threatened to impose financial sanctions, the Metropolitan Government of Nashville and Davidson County ("city") instituted a mandatory inspection maintenance program for all light duty vehicles registered in Davidson County. The city contracted with Metropolitan Air Research Testing Authority, Inc. ("MARTA") to provide inspections at six sites throughout Davidson County.[1]

The city realized in early 1990 that it would be required to continue the inspection program because the amount of ozone still exceeded acceptable limits. The Bureau of Environmental Health Services, the agency responsible for the inspection program, prepared new specifications that were incorporated into an invitation to bid issued by the Division of Purchases. The specifications called for a program substantially similar to the one already being provided by MARTA. Since the mayor desired to provide seven inspection sites, the specifications also requested bids for a six-site or, in the alternative, a seven-site program.

The Division of Purchases conducted a prebid conference in April, 1990 and later responded to several requests from bidders for clarification of the specifications. When the three bids were opened on June 1, 1990, the Division found that Hamilton Test Systems, Inc. ("Hamilton")[2] had submitted a bid that was $.80 per test lower than MARTA's bid.[3]

The Division of Purchases referred the bids to the Bureau of Environmental

---

1. MARTA and the city first entered into a two-year contract beginning on January 1, 1985. The city later extended the contract through 1990.

2. Hamilton, a division of United Technologies Corporation, had been in the emission inspection business for over fifteen years. At the time it submitted its proposal, it operated inspection and maintenance programs in Arizona, Connecticut, Ohio, and Wisconsin.

3. Hamilton's bid for a six-site program was $4.90 per test while MARTA's bid was $5.70 per test. Its bid for a seven-site site program was $1.31 per test lower than MARTA's bid.

Health Services. On June 13, 1990, the bureau director prepared a report of his "initial evaluation" that concluded that all the bids contained "deficiencies." Notwithstanding the shortcomings in Hamilton's bid, the director recommended that the city meet with Hamilton to determine whether "the site deficiency can be corrected" and that Hamilton should be awarded a contract for a six-site program if the deficiency could be corrected without increasing the cost of the tests.

The bureau director's conclusion that Hamilton's bid was not responsive was, in large part, based on his belief that one of Hamilton's proposed sites did not comply with the specifications because it was more than one-eighth of a mile from a major street. After being informed by the Metropolitan Legal Department that the specifications also permitted sites that were within sight of a major street, the director reinspected the site and determined that it was acceptable.

In the meantime, the city's purchasing agent also reviewed the bids and prepared his own report dated June 18, 1990. He was unaware at the time that the director of the Bureau of Environmental Health Services had changed his opinion about Hamilton's bid. Even though he thought that MARTA had "more to offer in terms of proven service locally," the purchasing agent recommended that no contract be awarded because "[t]here are sufficient descrepancies [sic] in formality and specifications to reject all bids." His decision with regard to the discrepancies in Hamilton's bid was largely based on the director's June 13, 1990 memorandum.

The mayor held a private meeting on June 22, 1990, to discuss the outcome of the bids and the feasibility of providing seven testing sites instead of six. The finance director, the purchasing agent, the director of the Bureau of Environmental Health Services, and the law director attended. The bureau director informed the group that he had revised his opinion about the discrepancies in Hamilton's bid and stated that several of the discrepancies noted by the purchasing agent were based on

overly restrictive interpretations of the specifications that he had prepared.

The purchasing agent, who had the ultimate authority to award the contract, decided to defer to the Bureau of Environmental Health Services because the bureau's director had prepared the specifications, had reinspected the sites and had satisfied himself that Hamilton's bid was responsive. He announced that all his questions had been answered satisfactorily and that he intended to award the contract for a six-site inspection program to Hamilton subject to the finance director's certification that funds were available.

On June 26, 1990, the purchasing agent informed Hamilton that he was "tentatively" awarding the inspection contract to them. MARTA requested a hearing before the Standards and Specifications Review Committee when it learned of the purchasing director's decision. The Committee considered MARTA's objections on July 12, 1990, and concurred in awarding the contract to Hamilton. Thereafter, Hamilton and the appropriate city officials executed a contract to provide vehicle inspections through 1995.

MARTA filed suit against the city on August 8, 1990, requesting the trial court to order that the contract be rebid because the June 22, 1990 meeting violated the Sunshine Law and because Hamilton's bid was not responsive to the specifications. The city moved for summary judgment on MARTA's Sunshine Law claim. Hamilton intervened and moved to dismiss the suit on the ground that MARTA lacked standing to challenge the contract's compliance with the competitive bidding requirements. MARTA also moved for summary judgment on its claims. The trial court granted the city's and Hamilton's motions and dismissed MARTA's complaint.

## II.

We will first consider whether MARTA has standing to challenge the award of the vehicle inspection maintenance contract to Hamilton. The trial court found that MARTA lacked standing because there was no causal connection between MARTA's

claimed injury and the city's conduct since MARTA itself could not have received the contract. We disagree. MARTA has alleged a sufficiently personal stake in the outcome of this dispute to have standing not only to assert its Sunshine Law claim but also its claims based on the city's competitive bidding requirements.

### A.

 Standing is a judge-made doctrine used to determine whether a party is entitled to judicial relief. *Knierim v. Leatherwood,* 542 S.W.2d 806, 808 (Tenn.1976). It requires the court to decide whether the party has a sufficiently personal stake in the outcome of the controversy to warrant the exercise of the court's power on its behalf. *Browning–Ferris Indus., Inc. v. City of Oak Ridge,* 644 S.W.2d 400, 402 (Tenn.Ct.App.1982). To establish standing, a party must demonstrate (1) that it sustained a distinct and palpable injury, (2) that the injury was caused by the challenged conduct, and (3) that the injury is apt to be redressed by a remedy that the court is prepared to give. *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); *Morristown Emergency & Rescue Squad, Inc. v. Volunteer Dev. Co.,* 793 S.W.2d 262, 263 (Tenn.Ct.App. 1990) ("Standing requires not only a distinct and palpable injury but also a causal connection between the claimed injury and the challenged conduct."); 13 Charles A. Wright, et al. *Federal Practice and Procedure* § 3531.4, at 418 (2d ed. 1984) ("Wright").

 The primary focus of a standing inquiry is on the party, not on the merits of the claim. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *City Communications, Inc. v. City of Detroit,* 888 F.2d 1081, 1086 (6th Cir.1989); *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038, 1041 (D.C.Cir.1989). Thus, a party's standing does not depend on the likelihood of success of its claim on the merits. *Hill*

*v. City of Houston,* 764 F.2d 1156, 1159–60 (5th Cir.1985).

Even though standing does not depend on the merits, it often turns on the nature and source of the claim asserted. Thus, the inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S. at 752, 104 S.Ct. at 3325; *Curve Elementary Sch. Parent and Teacher's Org. v. Lauderdale County Sch. Bd.,* 608 S.W.2d 855, 858 (Tenn.Ct.App.1980) ("[I]t is both appropriate and necessary to look to the substantive issues ..." (quoting *Flast v. Cohen,* 392 U.S. at 101–02, 88 S.Ct. at 1953)).

When the claimed injury involves the violation of a statute, the court must determine "whether the ... statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970) (The plaintiff's complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."); *Pen–Nor, Inc. v. Oregon Dep't of Higher Educ.,* 87 Or.App. 305, 742 P.2d 643, 646 (1987); *Chattanooga Ry. & Light Co. v. Bettis,* 139 Tenn. 332, 337, 202 S.W. 70, 71–72 (1917).

### B.

MARTA's lawsuit challenging the city's decision to award the contract to Hamilton essentially embodies two theories. First, MARTA asserts that the city officials responsible for awarding the contract violated the Sunshine Law, Tenn.Code Ann. §§ 8–44–101 to –108 (1988 & Supp.1991), by holding the June 22, 1990 meeting. Second, it contends that the procurement process violated the competitive bidding requirements contained in the Metropolitan Charter and ordinances and in the bid specifications. In light of Hamilton's objection

to MARTA's standing, we must determine whether the statutes, ordinances, and other provisions on which MARTA relies are broad enough to include unsuccessful bidders like MARTA within their protection.

### The Sunshine Law Claims

Public knowledge of the manner in which governmental decisions are made is an essential part of the democratic process. The public

> must be able to "go beyond and behind" the decisions reached and be appraised of the "pros and cons" involved if they are to make sound judgments on questions of policy and to select their representatives intelligently.

Note, *Open Meeting Statutes: The Press Fights for the "Right to Know"*, 75 Harv. L.Rev. 1199, 1200–01 (1962). Thus, Tennessee's Sunshine Law prevents government bodies from conducting the public's business in secret. *See* Tenn.Code Ann. § 8–44–101(a).

■ The Sunshine Law is remedial. *Dorrier v. Dark*, 537 S.W.2d 888, 891 (Tenn.1976). It should, therefore, be construed broadly to promote openness and accountability in government, *Booth Newspapers, Inc. v. University of Michigan Bd. of Regents*, 192 Mich.App. 574, 481 N.W.2d 778, 782 (1992), and to protect the public against closed door meetings at every stage of a government body's deliberations. *Kilgore v. R.W. Page Corp.*, 261 Ga. 410, 405 S.E.2d 655, 657 (1991); *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 300 (Tex. 1990).

Tenn.Code Ann. § 8–44–106(a) provides that actions to enforce the Sunshine Law may be brought by "any citizen of this state." Thus, in keeping with the remedial nature of the statute, we should interpret the term "citizen" broadly in order to give the Sunshine Law the fullest possible effect consistent with the General Assembly's intent. This court has already concluded that an "unincorporated association" of state residents had standing to bring a Sunshine Law action pursuant to Tenn.Code Ann. § 8–44–106(a). *Curve Elementary Sch. Parent & Teacher's Org. v.*

*Lauderdale County Sch. Bd.*, 608 S.W.2d 855, 859–60 (Tenn.Ct.App.1980).

■ MARTA is a Tennessee corporation whose principal place of business is in Nashville. It is, therefore, a resident of this state and of Nashville. *See V.L. Nicholson Co. v. Transcon Inv. and Fin. Ltd* 595 S.W.2d 474, 480 (Tenn.1980); *Skaggs v. Tennessee Cent. Ry.*, 193 Tenn. 384, 386, 246 S.W.2d 55, 55 (1952). Since MARTA is a resident of the state, it has standing under Tenn.Code Ann. § 8–44–106(a) to bring suit to test the city's compliance with the Sunshine Law.

### The Competitive Bidding Claims

For many years, the courts held that unsuccessful bidders did not have standing to challenge the award of a public contract because they had no right to contract with the government. *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 132, 60 S.Ct. 869, 879, 84 L.Ed. 1108 (1940); 10 Eugene McQuillin, *The Law of Municipal Corporations* § 29.83.05 (Gail A. O'Gradney & Charity R. Miller, eds., rev. 3d ed. 1990) ("McQuillin"). That view is now giving way to a growing number of decisions permitting suits for declaratory or equitable relief by prospective or disappointed bidders who have been aggrieved by a refusal to award a public contract to the lowest responsible qualified bidder.

■ One of the purposes of competitive bidding is to provide bidders with a fair opportunity to compete for public contracts. *State ex rel. Leech v. Wright*, 622 S.W.2d 807, 815 (Tenn.1981). Thus, the courts have recognized that the statutes and ordinances requiring competitive bidding impose upon the government an implied obligation to consider all bids honestly and fairly. *CACI, Inc.—Federal v. United States*, 719 F.2d 1567, 1573 (Fed.Cir.1983); *Blackwell v. United States*, 23 Cl.Ct. 746, 749 (1991); *Computer Shoppe, Inc. v. State*, 780 S.W.2d 729, 737 (Tenn.Ct.App. 1989).

Since bidders have a right to compete on the same footing, *Motor Coach Indus., Inc. v. Dole*, 725 F.2d 958, 964 (4th Cir.

1984), their rights fall within the zone of procedural interests protected by competitive bidding requirements. *Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 616 (11th Cir.1985); *CACI, Inc.—Federal v. United States,* 719 F.2d at 1572; *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 719 (2d Cir.1983); Wright, *supra,* § 3531.8, at 535–38. Therefore, the loss of an opportunity to receive or to compete for a public contract is a distinct injury sufficient to provide a disappointed bidder with standing. *CC Distribs., Inc. v. United States,* 883 F.2d 146, 149–50 (D.C.Cir.1989); Wright, *supra,* § 3531.4, at 430.

■ Competitive bidding laws also promote the public interest by guarding against favoritism and fraud. *Johnson City v. Carnegie Realty Co.,* 166 Tenn. 655, 661, 64 S.W.2d 507, 509 (1933); *Computer Shoppe, Inc. v. State,* 780 S.W.2d at 737. Unsuccessful bidders are most likely to have an incentive to bring suit to compel agencies to comply with the requirements controlling government contracts. *CACI, Inc.—Federal v. United States,* 719 F.2d at 1572 (quoting *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859, 864 (D.C.Cir.1970)); *Stanley Magic–Door, Inc. v. City of Chicago,* 74 Ill.App.3d 595, 30 Ill.Dec. 499, 501, 393 N.E.2d 535, 537 (1979). Accordingly, an increasing number of courts recognize that unsuccessful bidders have standing to vindicate the public's interest in competitive bidding. *Walt Bennett Ford, Inc. v. Pulaski County Special Sch. Dist.,* 274 Ark. 208, 624 S.W.2d 426, 428 (1981); *Spiniello Constr. Co. v. Town of Manchester,* 189 Conn. 539, 456 A.2d 1199, 1202 (1983); *Young v. Village of Glen Ellyn,* 120 Ill. App.3d 692, 76 Ill.Dec. 483, 485, 458 N.E.2d 1137, 1139 (1983); *Wilson Bennett, Inc. v. Greater Cleveland Regional Transit Auth.,* 67 Ohio App.3d 812, 588 N.E.2d 920, 924 (1990). However, in the absence of a statute, an unsuccessful bidder's standing extends only to equitable or declaratory relief to ensure enforcement of required competitive bidding procedures. *Stride Contracting Corp. v. Board of Contract & Supply,* 181 A.D.2d 876, 581 N.Y.S.2d 446, 448 (1992); *Conway Corp. v. Construction*

*Eng'rs, Inc.,* 300 Ark. 225, 782 S.W.2d 36, 41 (1989).

This court has aligned itself with the jurisdictions holding that unsuccessful bidders for public contracts have standing to challenge the award or execution of a public contract contrary to law. Over ten years ago, we held that an apparent low bidder had standing to sue a city for its failure to comply with competitive bidding requirements. *Browning–Ferris Indus., Inc. v. City of Oak Ridge,* 644 S.W.2d at 401–02. This case requires us to decide whether the *Browning–Ferris* rationale should be extended to unsuccessful bidders who would not necessarily have been awarded the contract had the government complied with the competitive bidding requirements.

■ A bidder need not be the low bidder in order to have standing to challenge a public contract. Courts have consistently held that second low bidders may challenge a contract. *Choctaw Mfg. Co. v. United States,* 761 F.2d at 615; *CACI, Inc.—Federal v. United States,* 719 F.2d at 1575; *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d at 860; *State Mechanical Contractors, Inc. v. Village of Pleasant Hill,* 132 Ill.App.3d 1027, 87 Ill.Dec. 532, 534, 477 N.E.2d 509, 511 (1985). Thus, a bidder need not show that it would have been awarded the contract had it not been for the challenged conduct. *Vulcan Eng'g Co. v. United States,* 16 Cl.Ct. 84, 88 (1988). Generally, a bidder need only show that its bid was responsive and within the zone of active consideration. *CACI, Inc.—Federal v. United States,* 719 F.2d at 1574–75; *Blackwell v. United States,* 23 Cl.Ct. at 749; *Morgan Business Assocs. v. United States,* 619 F.2d 892, 895, 223 Ct.Cl. 325 (1980); *Kennedy Temporaries v. Comptroller of the Treasury,* 57 Md.App. 22, 468 A.2d 1026, 1033 (1984) (the plaintiff did not submit a responsive bid); *F-M Asphalt, Inc. v. North Dakota State Highway Dep't,* 430 N.W.2d 344, 346 (N.D.1988) (the bidder had no standing because its bid was not responsive on its face).

The city's charter[4] and ordinances[5] require that the vehicle inspection maintenance contract to be awarded through competitive bidding. In addition, Section 42.C. of the contract's terms and specifications provided that a bid "will not be accepted if it does not meet site, facility and/or equipment specifications." Thus, by law, the city could only award this contract to the lowest qualified and responsive bidder.

MARTA was not the lowest bidder, and it has conceded that its bid was not responsive to the specifications included in the invitation to bid. These concessions would, under normal circumstances, have deprived MARTA of standing to challenge the award of the contract. However, they are not fatal to MARTA under the facts of this case.

MARTA argues that none of the three bidders submitted a responsive bid. If none of the bids were responsive, MARTA correctly points out that the city could not award a contract and, instead, would be required to accept new bids. Thus, MARTA argues, the city's decision to award the contract to Hamilton, whose bid was also not responsive, violated the competitive bidding requirements.

MARTA has standing to assert this claim. It has been prevented from competing again for a government contract by the city's decision to award the contract to Hamilton. It has a personal, distinct interest in the outcome of the dispute because, if successful, it will have another opportunity to compete for the contract. Accordingly, we vacate the portion of the trial court's order finding that MARTA does not have standing to challenge the manner in which the city awarded the vehicle inspection maintenance contract.

### III.

Having determined that MARTA has standing to assert a Sunshine Law claim against the city, we now turn to the merits of the claim itself. The trial court found that the city did not violate the Sunshine Law because the decision to award the vehicle inspection maintenance contract was not made at a meeting of a governing body. We concur.

### A.

The responsibility for procuring goods and services for most of the city's departments rests on the purchasing agent. *See* Metropolitan Charter §§ 8.109, 8.110, 8.111. Upon receipt of a requisition for goods or services costing more than one thousand dollars, the purchasing agent prepares the specifications, Metro Ord. § 15-1-18(a), and issues the advertisements or invitations to bid. Metro Ord. § 15-1-19(a), -19(b). After the bid opening, Metro Ord. § 15-1-19(d), the purchasing agent requests the requisitioning agency to review the bids, Metro Ord. 15-1-19(e), and obtains a certification from the finance director that funds for the contract are available. Metro Ord. § 15-1-18(b). Thereafter, the purchasing agent "with the approval of the mayor" makes all determinations with regard to the award of contract. Metro Ord. § 15-1-19(e).

The Sunshine Law applies to meetings of public bodies "for which a quorum is required in order to make a decision or to deliberate toward making a decision on any matter." Tenn.Code Ann. § 8-44-102(c). It has never been interpreted to apply to meetings pertaining to decisions made by single public officials. *Fain v. Faculty of College of Law*, 552 S.W.2d 752, 754 (Tenn. Ct.App.1977) (meeting of an advisory committee to a law school dean were not required to be open); *see also Mid-South Publishing Co. v. Tennessee State University & Community College Sys.*, App. No. 01-A-01-9002-CH-00074, slip op. at 11, 16

---

4. Section 8.111 of the Metropolitan Charter provides that "[b]efore making a purchase or contract requiring expenditure of a sum in excess of one thousand ($1,000) dollars, the purchasing agent shall take competitive bids under such rules and regulations as may be established by ordinance."

5. Metropolitan Ordinance No. 15-1-18(b) provides that "[p]urchase orders will be issued only to the parties making the lowest competent and responsible bid in accordance with the specifications contained in the invitation to bid."

T.A.M. 5–8, 1990 WL 207410 (Tenn.Ct.App. Dec. 19, 1990) (meeting of the chancellor's advisory committee was not required to be open because the decision was the chancellor's alone); *Memphis Publishing Co. v. City of Memphis*, Shelby Eq., slip op. at 4, 3 T.A.M. 36–19 (Tenn.Ct.App. Aug. 7, 1978) (labor negotiations conducted by the mayor).

■ The June 22, 1990 meeting was not a meeting of a governing body. The group assembled in the mayor's office consisted of various city officials with separate roles in the procurement process, but the group was neither created nor recognized by the Metropolitan Charter, the city ordinances, or the rules and regulations of the Division of Purchases. The group was not required to have a quorum or to deliberate, or even to make recommendations to a public body.

The decision on whether to award the contract rested with the purchasing agent. At most, the officials attending the meeting were providing the purchasing agent with their opinions concerning whether he should award the contract to the company that submitted the lowest bid. The purchasing agent could have made a decision without the meeting. Accordingly, we find that the Sunshine Law did not require this meeting to be open to the public.

## IV.

The final issue concerns MARTA's claim that the city should not have awarded the contract to Hamilton because Hamilton's bid was not responsive to the specifications. The trial court denied MARTA's motion for summary judgment on this issue because MARTA "failed to adequately prove that the bidding process was not followed by the respondents." We agree. Even though we have determined that MARTA had standing to assert this claim, we find that the undisputed proof warrants the summary dismissal of the claim on the merits.

### A.

■ Courts are wary of unwarranted judicial intrusions into the performance of ordinary governmental activities. *Perkins*

*v. Lukens Steel Co.*, 310 U.S. 113, 130–32, 60 S.Ct. 869, 878–79, 84 L.Ed. 1108 (1940); *Washington Waste Sys., Inc. v. Clark County*, 115 Wash.2d 74, 794 P.2d 508, 512 (1990). Accordingly, judicial review of the acts of local administrative officials is generally confined to an examination of the evidence to determine whether "there is material evidence to support conclusions that are neither arbitrary nor unlawful." *Pace v. Garbage Disposal Dist.*, 54 Tenn. App. 263, 266, 390 S.W.2d 461, 463 (1965).

Since procuring goods and services is the type of routine activity that is best left to governmental officials, most courts have recognized that public procurement authorities have wide discretion with regard to accepting bids or any of the other details of entering into a contract. *Ohio River Conversions, Inc. v. City of Owensboro*, 663 S.W.2d 759, 761 (Ky.Ct.App.1984); *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 423 N.E.2d 1095, 1098 (1981); *Rollins Constr. Co. v. Tulsa Metro. Water Auth.*, 745 P.2d 1176, 1179 (Okla.1987); McQuillin, *supra*, § 29.72.

■ Purchasing officials must not be arbitrary, unreasonable, or capricious. *Wood–Hopkins Contracting Co. v. Roger J. Au & Son, Inc.*, 354 So.2d 446, 449–50 (Fla.Dist.Ct.App.1978). Thus, in the absence of fraud, corruption, or palpable abuse of discretion, the courts will ordinarily not interfere with governmental procurement decisions. *Burt v. Board of Educ.*, 132 Ill.App.3d 393, 87 Ill.Dec. 500, 503, 477 N.E.2d 247, 250 (1985); *Schekel v. Jackson County*, 467 N.W.2d 286, 290 (Iowa Ct. App.1991); McQuillin, *supra*, § 29.83.

### B.

■ MARTA bases its claim that Hamilton's bid was not responsive on the preliminary conclusions contained in the purchasing agent's June 18, 1990 memorandum. It overlooks the fact that after reviewing Hamilton's bid with the director of the Bureau of Environmental Health Services, the purchasing agent revised his decision and determined that Hamilton's bid was responsive, notwithstanding what he

thought were several technical, non-material irregularities.

MARTA has challenged several portions of Hamilton's bid at various stages of this case. It has either abandoned or has failed to raise many of these claims properly. For the purpose of this appeal, MARTA's challenge to Hamilton's bid centers on three areas: (1) Hamilton's failure to provide a separate layout for each inspection site; (2) the failure of two of Hamilton's sites to meet the specifications' minimum dimension requirements; and (3) the failure of one site to be close enough to a major arterial.

### The Site Plan Requirement

Section 42.F.4. of the specifications states that "[e]ach bidder shall provide a layout of the inspection facility and site and include an artist's conception of a representative facility." The purchasing agent initially decided that Hamilton's bid did not comply with this requirement because it contained only a general layout of a typical inspection facility. After the director of the Bureau of Environmental Health Services explained that the section was only intended to require submission of a typical layout, the purchasing agent determined that Hamilton's bid was responsive or, at most, contained a minor discrepancy.

The Bureau of Environmental Health Services inspected all of Hamilton's sites and certified to the purchasing agent that they complied with the specifications' layout requirements. Accordingly, we find that the purchasing agent did not act arbitrarily or unreasonably when he declined to disqualify Hamilton's bid because it did not include layouts for each inspection facility.

### The Minimum Size Requirement

The specifications do not contain a specific minimum size requirement. Section 6.A.5. states:

LAND REQUIREMENTS: The minimal land size for each test station shall conform to applicable zoning rules. Size and layout of each inspection site shall be such that additional test equipment and a minimum of one lane with queuing space can be added to a station at a later date if necessary. The Contractor shall demonstrate that lot size meets queuing and parking requirements.

The purchasing agent initially decided that two of Hamilton's sites were too small because their dimensions differed from the dimensions on the typical site plan included with Hamilton's bid. However, the purchasing agent again changed his mind and determined that Hamilton's bid was responsive after the director of the Bureau of Environmental Health Services stated that he had personally inspected all the sites and that they met Section 6.A.5.'s requirements. We find that the purchasing agent did not act unreasonably when he decided that Hamilton's bid was responsive to Section 6.A.5.

### The Proximity to a Major Arterial Road Requirement

The purchasing agent found that one of Hamilton's sites did not comply with the requirement in Section 5.1 of the specifications that "[e]ach testing and inspection site shall be located within ⅛ of a mile or within sight to a major arterial road as designated by the Metropolitan Planning Commission." This finding was based solely on a similar conclusion in the Bureau of Environmental Health Services' June 13, 1990 memorandum.

At the June 22, 1990 meeting in the mayor's office, the director of the Bureau of Environmental Health Services informed the purchasing agent that the conclusions in his June 13, 1990 memorandum were wrong because he had overlooked the fact that a site could comply with Section 5.1 if it was within site of a major arterial road. The director also stated that he had reinspected the site and had determined that it was, in fact, within sight of a major arterial road. Based on this information, the purchasing agent did not act unreasonably when he determined that Hamilton's bid was responsive to Section 5.1 of the specifications.

The proof shows that both the purchasing agent and the director of the Bureau of Environmental Health Services determined initially that Hamilton's bid did not comply with the specifications. In addition, it

shows that the purchasing agent and the director had slightly different interpretations concerning the specification requirements. However, in the final analysis, it also shows that the purchasing agent and the director eventually agreed on a common interpretation of the specifications and that the purchasing agent determined that Hamilton's bid was responsive. The purchasing agent's interpretation of the specifications did not give Hamilton an unfair advantage and did not amount to a circumvention of the competitive bidding requirements. Therefore, we find that the city is entitled to a summary judgment dismissing MARTA's claim that Hamilton should not have received the vehicle inspection maintenance contract because its bid was not responsive to the specifications.

## V.

We affirm the judgment and remand the case to the trial court for the entry of an order granting the city a summary judgment dismissing MARTA's claim that the city acted arbitrarily and unreasonably when it awarded the contract to Hamilton. We tax the costs to Metropolitan Air Research Testing Authority, Inc. and its surety for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.