IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 7, 2007 Session

## LANIER WORLDWIDE, INC. v. STATE OF TENNESSEE, ET AL.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 06-2030-II     The Honorable Carol McCoy, Chancellor**

_____

**No. M2006-02630-COA-R3-CV - Filed on April 17, 2007**

_____

This case involves the protest of a bid made pursuant to an invitation to bid issued by the State for copy machines. Upon protest made by several of the bidders as to the bid made by the selected bidder, the board of standards, after review, awarded the contract to the selected bidder. The next qualified bidder filed suit in chancery court, and the chancery court reversed the decision of the board of standards and awarded the contract to the complaining bidder. The State-defendants and the selected bidder appeal. We reverse and remand.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Janie C. Porter, Senior Counsel, for Appellants, State of Tennessee

William B. Hubbard and Marc Jenkins of Nashville, Tennessee; J. Richard Lodge Jr., and Russell S. Baldwin of Nashville, Tennessee for Appellant, Océ Imagistics, Inc.

James A. DeLanis, Darwin A. Hindman, III and Mary Ann Miranda of Nashville, Tennessee for Appellee, Lanier Worldwide, Inc.

**OPINION**

This case arises from protests filed by Lanier Worldwide, Inc. ("Lanier," "Plaintiff," or "Appellee") and Oce′ Imagistics, Inc. ("Oce′") concerning the State of Tennessee's ("State") procurement of leases for copy machines (the "Copier Contract") through its General Services Department ("General Services"). T.C.A. § 12-3-214 (Supp. 2006) outlines the procedure for such protests. Under this statute, General Services has the initial authority "to settle and resolve a protest of a bidder...." T.C.A. § 12-3-214(c). If the protester is not satisfied with the resolution by General

Services, then the protester may appeal the General Services' decision to the Board of Standards (the "Board"). T.C.A. § 12-3-214(c)(2). The Board is comprised of the Comptroller of the Treasury, (John G. Morgan) the Commissioner of General Services, (Gwendolyn Sims Davis) and the Commissioner of Finance and Administration (Dave Goetz) (together with Mr. Morgan, Ms. Davis, and the State, "State Defendants," and, together with Oce′, "Appellants"). The statute also provides that the protester may request a stay of proceedings with award of the disputed contract. T.C.A. § 12-3-214(d). Following the execution of any contested contract, the administrative process provides that the protester may file a claim against the State for money damages in the Claims Commission. T.C.A. § 12-3-214(e).

Beginning in September 2005, General Services, through its Purchasing Division, publicly advertised for bids for the Copier Contract. On January 6, 2006, the State issued an Invitation to Bid ("ITB") soliciting competitive bids for the Copier Contract. Two of the bidders were Oce′ and Lanier. When the bids were opened on January 23, 2006, the Purchasing Division recommended that the Copier Contract be awarded to Oce′. Lanier was the second lowest bidder. The bids were made available for public inspection on February 14, 2006. Thereafter, Lanier and others filed protests with General Services concerning the State's decision to award the Copier Contract to Oce′. Specifically, Lanier asserted that Oce′'s bid was non-responsive in that the productivity level of one of Oce′'s copy machines (the Oce′ 2110) did not meet the ITB's specifications for the productivity of the document feeder. By letter of March 3, 2006, General Services suspended the Copier Contract award until the matter could be resolved. Following an informal hearing on March 23, 2006, General Services addressed Lanier's protests by letter dated April 10, 2006. In that letter, General Services states that, "[i]n order to ensure securing adequate competition for the solicitation of bids for the statewide copier contract, all bids on [the Copier Contract] should be rejected, and the process begun anew...." Because General Services decided to re-bid the Copier Contract, it did not reach the issue of Oce′'s alleged failure to submit a responsive bid and, instead, specifically pretermitted that issue.

Lanier and Oce′ both appealed General Services' decision rejecting all bids to the Board. The Board held a hearing on July 27, 2006 and found, *inter alia*, that the bids should not have been rejected, and that Oce′'s bid was responsive to the ITB. The Board's findings were set out in a letter to the protesters dated August 7, 2006.

On the morning of August 15, 2006, the Copier Contract was fully executed and awarded to Oce′. Later, on that same day, Lanier filed a "Verified Complaint for Declaratory Relief, To Extend the Stay of the Award of a State Contract, or for Temporary Restraining Order, Preliminary Injunction and Injunctive Relief" (the "Complaint") against the State Defendants.[1] By its Complaint, Lanier sought, *inter alia*: a declaration that the selection or attempted selection of Oce′ for the Copier Contract was illegal and void; a temporary restraining order, preliminary injunction, and a permanent injunction against the award of the Copier Contract to Oce′, and for other further and general relief.

---

[1] On August 18, 2006, Lanier filed an amendment to the original Complaint in order to add additional allegations and requests for relief.

Also on August 15, 2006, Lanier filed its "Motion to Continue Stay and for Entry of Temporary Restraining Order, Temporary Injunction or Other Injunctive Relief" along with a Memorandum in support thereof.

On August 16, 2006, Oce′ filed a "Motion to Intervene and Opposition to TRO." Attached to this Motion is an exhibit titled "Statewide Contract Award," which reflects that the Copier Contract had been awarded to Oce′. By its Motion, Oce′ asserted that, because the Copier Contract had been awarded, Lanier's request for a TRO was moot and should be denied. Oce′ also asserted that Lanier's "exclusive remedy" was "before the Claims Commission on damages." An "Agreed Order of Intervention" was entered on August 23, 2006. Thereafter, the trial court denied Lanier's request for a TRO and, in denying same, noted that "[c]opy of contract reflects contract awarded August 15, 2006." On August 21, 2006, the State filed the administrative record.

On August 21, 2006, Oce′ filed a Motion to Dismiss on the grounds that the Lanier's Complaint was moot because it sought to enjoin a contract that had already been awarded. Oce′ further asserted that the trial court lacked jurisdiction over claims for monetary damages. Contemporaneous with the Motion to Dismiss, Oce′ moved the court for an expedited hearing on that Motion and specifically requested that the Motion be heard on August 24, 2006 at the same time as Lanier's Motion for Temporary Injunction. However, Oce′ did not set the Motion to Dismiss or the Motion for Expedited Hearing on the court's docket as required by the Davidson County Local Rules of Practice. By Order of September 1, 2006, the hearing on Lanier's Motion for Temporary Injunction was postponed to September 8, 2006.

Various filings took place in the following weeks. On November 2, 2006, a hearing on the merits took place. At that hearing, the trial court denied Lanier's request for a temporary injunction as reflected by the Order entered on November 28, 2006. On November 14, 2006, the trial court entered its "Memorandum and Order," in which it found, in relevant part, that: [tr 4 509]

> [T]he Board of Standards violated state statutes, the Rules of the Purchasing Division and fundamental principles of the bid process by allowing Oce′ to make substantive bid modifications after the bid opening. The action of the Board was illegal and absent the illegally permitted supplemental documents and explanations, arbitrary. Accordingly, the award to Oce′ is declared void and of no effect. The State is enjoined from proceeding any further with Oce′ contract. Bond is set at $500,000.00. This cause is remanded to the Board with instructions to adhere to fair and proper bid procedures and to make an appropriate award in keeping with the sound principles of the competitive bid process.

At the November 14, 2006 hearing, the trial court also denied Oce′'s request for stay as reflected in the November 28, 2006 Order.

On November 20, 2006, Oce′ filed its Notice of Appeal. On December 13, 2006, the State Defendants filed their Notice of Appeal and motion for stay. On December 15, 2006, this Court entered an Order staying the trial court's November 14, 2006 Order pending the resolution of the appeal.

The State Defendants raise the following issues for review as stated in their brief:

> 1. Whether the Chancery Court erred in failing to dismiss Lanier's claim for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.
>
> 2. Whether the Chancery Court erred by improperly substituting its judgment for the decision of the Board of Standards, finding that the Board of Standards acted illegally and arbitrarily, enjoining the State, and voiding the contract.
>
> 3. Whether the Chancery Court erred in finding that no authority exists for a post bid opening clarification procedure.

Oce′ raises four issues for review as stated in its brief:

> 1. Whether Oce′'s bid is responsive to the Invitation to Bid ("ITB").
>
> 2. Whether the Chancery Court had jurisdiction to entertain the appeal after the award of the contract and after performance under the contract.
>
> 3. Whether the Chancery Court erred in relying on provisions of the State's Invitation to Bid {"ITB") that are not applicable to [the] dispute before it.
>
> 4. In the event the State's contract award was improper, whether the Chancery Court erred in holding the contract void *ab initio*.

We will consider the State's first issue for review:

> 1. Whether the Chancery Court erred in failing to dismiss Lanier's claim for lack of subject matter jurisdiction and failure to state a claim upon which relief may be granted.

The board of standards, by letter dated August 7, 2006, held that the Océ bid was responsive, and the contract would be awarded to Océ, which was done upon its execution August 15, 2006. On August 15, 2006, subsequent to the award and execution of the contract to Océ, Lanier filed this

action, which seeks, among other things, an injunction to enjoin the award of the contract to Océ and, as subsequently amended, to enjoin the continued operation of the contract. Pursuant to the provisions of T.C.A. 12-3-214 (2006 Supp.), bidders have a right to protest to the commissioner of general services any aggrievement they might have in connection with the bid process, and the commissioner is authorized to resolve the protests so made. T.C.A. 12-3-214 (a)(b)(c)(1). If the controversy is not resolved by the commissioner in a manner satisfactory to the protestor, the matter may be considered by the board of standards. T.C.A. § 12-3-214 (c)(2).

T.C.A. § 12-3-214 further provides specifically:

> (d) Stay of Procurements During Protests. Prior to the award of a contract, bidders who have protested may submit to the commissioner a written petition for stay of award. Such stay shall become effective upon receipt by the state. The state shall not proceed further with the bid process or with the award of the contract until the protest has been resolved in accordance with this section, unless the board of standards makes a written determination that continuation of the bid process or the award of the contract without delay is necessary to protect substantial interests of the state. It shall be the responsibility of the commissioner, with the assistance of the procuring agency, to seek such a determination by the board of standards.

> (e) Protests Subsequent to Award. The Tennessee claims commission has exclusive jurisdiction to determine all monetary claims against the state under this section for the negligent deprivation of statutory rights

Significantly, the general assembly provided that protestors would be protected by a stay prior to the award of a contract and, moreover, specifically provided that protests subsequent to the award belong in the exclusive domain of the Tennessee Claims Commission. The legislature is deemed to be aware of the long-standing common law of the state that where it appears that the act to be enjoined has been consummated, an action for an injunction presents only a moot question and will be dismissed. *See Badgett v. Broome*, 409 S.W.2d 354 (Tenn. 1966)(citing *Malone v. Peay*, 157 Tenn. 429, 7 S.W.2d 40 (1928)); *Boyce v. Williams*, 389 s.W.2d 272 (Tenn. 1965).

In construing statutes, the Court's role is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope. *Sallee v. Barrett*, 171 S.W.3d 822 (Tenn. 2005); *McGee v. Best*, 106 S.W.3d 48 (Tenn. Ct. App. 2002). In *McGee*, the Court said:

> The rule of statutory construction to which all others must yield is that the intention of the legislature must prevail. *Mangrum v. Owens*, 917 S.W.2d 244, 246 (Tenn. Ct. App. 1995)(citing *Plough,*

*Inc. v. Premier Pneumatics, Inc.*, 660 S.W.2d 495, 498 (Tenn. Ct. App. 1983);  *City of Humboldt v. Morris*, 579 S.W.2d 860, 863 (Tenn. Ct. App. 1978)).  "[L]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, when read in the context of the entire statute, without any forced or subtle construction to limit or extend the import of the language." *Id*.  (citing *Worrall v. Kroger Co.*, 545 S.W.2d 736, 738 (Tenn. 1977)).  The Court has a duty to construe a statute so that no part will be inoperative, superfluous, void or insignificant.  The Court must give effect to every word, phrase, clause, and sentence of the Act in order to achieve the Legislature's intent, and it must construe a statute so that no section will destroy another.  *Id*. (citing *City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn. Ct. App. 1983);  *Tidwell v. Collins*, 522 S.W.2d 674, 676 (Tenn. 1975).

*Id.* at 64.

The trial court, in its opinion, states: "This court may entertain judicial review of any agency's administrative action, even though the agency has already awarded the contract. *Metropolitan Air Research Testing Authority, Inc. v. Metro Gov't of Nashville and Davidson County*, 842 S.W.2d 611 (Tenn. Ct. App. 1992), perm. app. denied (Nov. 30, 1992)."  This Court has no quarrel with the statements by the trial court; however, it appears that in the *Metropolitan Air Research* case, the question of mootness was not raised and, in fact, this Court affirmed the trial court's judgment and remanded the case to the trial court for the entry of an order granting the city a summary judgment and dismissing the claim against the city for allegedly acting arbitrarily and unreasonably.  We do not consider the decision in *Metropolitan Air Research* to mean that the Court may enjoin an act that has already happened.

In this case, Lanier failed to act promptly and file suit to seek a stay and other relief. Accordingly, the judgment of the trial court is reversed.  We will, however, consider the other issues for review.

The second issue for review raised by the State is:

> 2.  Whether the chancery court erred by improperly substituting its judgment for the decision of the Board of Standards, finding that the Board of Standards acted illegally and arbitrarily, enjoining the State, and voiding the contract.

In *International Business Machines Corp. v. Board of Standards of the State of Tennessee*, 1992 WL 184805 (Tenn. Ct. App. Aug. 5, 1992), one of the issues for review was whether the proper standard of review of the decision of the board of standards is under the common law writ of certiorari.  The Court held that "where the administrative agency is performing a function that is

essentially legislative or administrative, only a narrow review under the common law writ is available. *Hoover Motor Express Co. v. Railroad and Public Utilities Commission,* 195 Tenn. 593, 261 S.W.2d 233 (1953); *People's Bank of Van Leer v. Bryan*, 55 Tenn. App. 166, 397 S.W.2d 401 (1965). The Court explained:

> In hearing the protest, the Board performs a function that is essentially administrative. Evaluating a bid to see if it complies with the ITB is a function of the Department of General Services, one which the agency must perform daily in carrying out its administrative duties. Where disputes arise in connection with the department's administration of the state procurement system, the power to resolve the dispute is given to the Board. But the function is still administrative, much like the functions performed by the Commissioner of Insurance in ruling on an application for a rate increase, *Pack v. Royal Globe Ins. Co.*, 224 Tenn. 452, 457 S.W.2d 19 (1970), or the Superintendent of Banks in ruling on an application to establish a branch bank. *People's Bank of Van Leer v. Bryan*, 55 Tenn.App. 166, 397 S.W.2d 401 (1965).
>
> Therefore, the courts must limit their review of the Board's decision to the narrow scope of the common law writ.

*Id.* at *2.

Proceedings under the common law writ of certiorari are limited in the courts to the question of whether an administrative board acted fraudulently, illegally, or exceeded its jurisdiction and if, upon the examination of the evidence before board, the court finds that there is any material evidence to sustain the board's finding, its action could be affirmed. *City of Memphis v. Sherwood Bldg. Corp.*, 208 Tenn. 17, 343 S.W.2d 869 (1961).

In *Robinson v. Clement*, 65 S.W.3d 632 (Tenn. Ct. App. 2001), this Court stated:

> A common-law writ of certiorari is an extraordinary judicial remedy. *Robinson v. Traughber*, 13 S.W.3d 361, 364 (Tenn.Ct.App.1999); *Fite v. State Bd. of Paroles*, 925 S.W.2d 543, 544 (Tenn.Ct.App.1996). It is not available as a matter of right, *Boyce v. Williams*, 215 Tenn. 704, 713-14, 389 S.W.2d 272, 277 (1965); *Yokley v. State*, 632 S.W.2d 123, 127 (Tenn.Ct.App.1981), but rather is addressed to the trial court's discretion. *Blackmon v. Tennessee Bd. of Paroles*, 29 S.W.3d 875, 878 (Tenn.Ct.App.2000). Accordingly, decisions to grant or deny a common-law writ of certiorari are reviewed using the familiar "abuse of discretion" standard. *Robinson v. Traughber*, 13 S.W.3d at 364. Under this standard, a reviewing court should not reverse a trial court's

discretionary decision unless it is based on a misapplication of controlling legal principles or a clearly erroneous assessment of the evidence, ***Overstreet v. Shoney's, Inc***., 4 S.W.3d 694, 709 (Tenn.Ct.App.1999), or unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the complaining party. ***Marcus v. Marcus***, 993 S.W.2d 596, 601 (Tenn.1999); ***Douglas v. Estate of Robertson***, 876 S.W.2d 95, 97 (Tenn.1994).

The scope of review under a common-law writ of certiorari is extremely limited. Courts may not (1) inquire into the intrinsic correctness of the lower tribunal's decision, ***Arnold v. Tennessee Bd. of Paroles***, 956 S.W.2d 478, 480 (Tenn.1997); ***Powell v. Parole Eligibility Review Bd.***, 879 S.W.2d 871, 873 (Tenn.Ct.App.1994), (2) reweigh the evidence, ***Watts v. Civil Serv. Bd. for Columbia***, 606 S.W.2d 274, 277 (Tenn.1980); ***Hoover, Inc. v. Metropolitan Bd. of Zoning Appeals***, 924 S.W.2d 900, 904 (Tenn.Ct.App.1996), or (3) substitute their judgment for that of the lower tribunal. ***421 Corp. v. Metropolitan Gov't***, 36 S.W.3d 469, 474 (Tenn.Ct.App.2000). Rather, the writ permits the courts to examine the lower tribunal's decision to determine whether the tribunal exceeded its jurisdiction or acted illegally, fraudulently, or arbitrarily. ***Turner v. Tennessee Bd. of Paroles,*** 993 S.W.2d 78, 80 (Tenn.Ct.App.1999); ***Daniels v. Traughber***, 984 S.W.2d 918, 924 (Tenn.Ct.App.1998).

***Id.*** at 635.

The trial court concluded that Océ submitted to the State a series of late bid modifications in order to cure a facially non-responsive bid and that, in effect, it was not a clarification of the bid. It thus appears that the seminal question involved is whether the State allowed and Océ proposed modifications to its bid as opposed to a clarification of what it had previously contained in its bid. Apparently, Lanier asserts that Océ was allowed to submit a different copying machine or different specs for a copying machine than the one on which it had initially bid. The record reflects, however, that the bid made by Océ, along with the other bidders, had been on machines that were capable of being networked, and the question really boiled down to whether the machine bid by Océ had the capability of a document feeder at 75 pages per minute. It is undisputed that Océ's bid price never changed, and it appears to contradict Lanier's assertion that a different machine at a higher cost was being offered the State after the bids had been opened. Océ's bid was considerably higher than Lanier's bid, because it included its sophisticated equipment that feeds 90 pages per minute.

The proceedings before the board reflect that Mr. Matt Ross, a buyer with general services, testified concerning the clarification required and how it arose.

MR. ROSS: With respect to specs with the Buyer's Lab on OCÉ, I know that it does include – 2110 does have options, PRISMA options.

I declared an intention to award. That's just merely an intention. After the intention, we then opened up the file for review so all these professionals from Lanier and Océ could come in and others to examine the file and look it over and raise questions. If in the case, like there was in this case, about engaging the document feeder and whatnot, they're almost a tool that helps us evaluate it as well.

So after my, you know, granting an intending to award, that's when Lanier posed a valid question. And I agreed with the question. That's when I went back to Océ and sought clarification because I couldn't find it in the BLI. So when Lanier raised that question, that's when we engaged in –

COMMISSIONER GOETZ: What clarification did you receive?

MR. ROSS: Clarification from Océ saying that – that's when the communication began with the letter dated February 21st in the protest packet there. That's the one where they spoke about it does indeed meet the specs. They mentioned the DocSetter, explained that. So therefore I prepared the intending –

COMMISSIONER GOETZ: So you have no reason to believe there was no intent not to bid the additional document feeder to improve the speed to meet the qualifications?

MR. ROSS: Honestly, sir, no. On the bid there's not a place for you to write in all the accessories that's going to be included with these machines. So you write your model in; you write your bid price. Therefore, you know, I agreed.

COMMISSIONER GOETZ: That's why you have to go seek clarification sometimes?

MR. ROSS: Absolutely. Yes, sir.

Mr. Thad Watkins, general counsel for the board of standards, then questioned Mr. Ross:

MR. WATKINS: Members of the Board, I want Matt Ross – Matt, if you could stand up. Matt, I want you to explain to the Board what you were just telling me, the issue that was raised by Lanier after it reviewed the file. I forget which tab where they allege that on its face it showed that it fell below performance standards.

Had you seen that or was that the first time you saw that problem was when Lanier brought it to you?

MR. ROSS: That was the first time I was aware of the problem.

MR. WATKINS: Did you miss it?

MR. ROSS: Right.

MR. WATKINS: You missed it.

MR. ROSS: That's why we open the file for inspection, to get people in the industry actually to point out mistakes or instances where we may have overlooked something. In this case that's what happened.

Let's propose I caught that on the front end and recommended to bypass Océ Imagistics for failing to meet the spec. Before we bypass them, we would have clarified with the company and sought clarification before we bypassed them and went on to the next low bidder so –

MR. WATKINS: The reason –

COMMISSIONER GOETZ: We've had clarifications before.

MR. WATKINS: Yes. And the reason you brought it up was not just because Lanier brought it up and you were trying to salvage the intended award, but that you just hadn't seen it before?

MR. ROSS: Exactly.

MR. WATKINS: And if you had seen it before, you would have sought clarification?

MR. ROSS: Absolutely.

-10-

MR. WATKINS: Before bypassing?

MR. ROSS: Right.

MR. WATKINS: That's exactly the same thing you did after Lanier brought the issue out.

MR. ROSS: The fact that Lanier caught it and I didn't catch it, that's regrettable. But they did catch it and once it was caught we acted in the way I would have acted if I had caught it.

MR. WATKINS: And you were satisfied with the clarifications that cured any potential – that clarified and satisfied you that they would, in fact, meet the entire level of the specification?

MR. ROSS: Yes, sir, I was.

The board of standards rendered its decision, and we quote from the record the comments made by each member:

COMMISSIONER GOETZ: There are a couple of things though that I think to me, at least, seem to be fairly clear indicators, two things. One is the amount of money on the bid documents submitted. That would seem to inlcude – it would seem to bear out the contention by Océ that they had included this high-speed document imager in their original proposal that was submitted at the time. It was there.

Secondly, in the letter cited on February 20th it does cite the 90-page-per-minute, which is the same as the ScanSubmit spec, at least as I understand it at this point.

It seems unclear as to exactly what the document was. It was at least unclear enough to get the – once it was brought to your attention, to get our buyer to seek a clarification. And it does not seem to have changed the substance of the bid given the apparent evidence that it was included in the original bid price. I find that, in my opinion, that the bid does not deserve to be disqualified.

COMPTROLLER MORGAN: I concur with that. I think you've stated it well. And, frankly, I don't know exactly – I don't know how – what we asked for was the machine manufacturer and model number. That's what they responded in their bid. It almost is

essential then to go behind in this case because it's – there's nothing in the literature suggesting there's a different model number as published in Buyer's Lab for this copier with the 90-page document feeder on it. So I'm not sure how they would ever be any more responsive than they were based on what they submitted.

So I concur with the Commissioner. I think it was perfectly appropriate. If the question be raised, I think it was perfectly appropriate the clarification be sought. There's nothing here to suggest to me that there would be anything different today than they [sic] were when the bid was originally submitted. I concur with the Commissioner.

COMMISSIONER DAVIS: I guess for me it was pretty clear to me just looking at the prices, your difference between the price of Océ.

As far as the clarification is concerned, I think you answered that very well. And to seek clarification on an item that you're not really sure of, that was appropriate. . . . Looking at the documents, it's evidence to me that – I don't feel this bid should be disqualified. I think there's sufficient documentation.

This Court noted in *Marta v. Metro. Gov. of Nashville*, 842 S.W.2d 611 (Tenn. Ct. App. 1992):

Courts are wary of unwarranted judicial intrusions into the performance of ordinary governmental activities . . . .

Since procuring goods and services is a type of routine activity that is best left to governmental officials, most courts have recognized that public procurement authorities have wide discretion with regard to accepting bids or any of the other details of entering into a contract. (citations omitted)

Purchasing officials must not be arbitrary, unreasonable, or capricious." *Wood-Hopkins Contracting Co. v. Roger J. Au & Son, Inc.*, 354 So.2d 446, 449-50 (Fla. Dist. Ct. App. 1978). Thus, in the absence of fraud, corruption, or palpable abuse of discretion, the courts will ordinarily not interfere with governmental procurement decisions."

*Id.* at 619.

From our review of the record, we find that there is substantial and material evidence in the record to support the decision of the board of standards that Océ met the specifications in the ITB. We further find that it was not improper for the department of general services to seek clarification for some of the issues raised by Lanier in order to be sure that the State was getting the best properly made bid in this proposed procurement. It appears that the trial court substituted its judgment for the board of standard's judgment.

The State's next issue for review is:
> 3. Whether the Chancery Court erred in finding that no authority exists for a post bid opening clarification procedure.

The trial court found that the purchasing department had no authority for seeking clarification of the bids proposed. Lanier cites no authority prohibiting clarification, and it appears from a review of the record that clarification is sought on occasion to prevent needless and unwarranted procedural difficulties in completing the bidding process. It certainly is not in dispute that clarification should not be used to correct an otherwise nonresponsive bid. That is not the case before us. The record does not indicate any unfair dealing or practices on the part of the State, and the clarification made by Océ established that its bid at the cost stated complied with the specifications of the ITB.

Accordingly, the judgment of the chancery court is reversed, and the case is remanded to the chancery court with instructions to dismiss the petition for writ of certiorari. Costs of the appeal are assessed against Appellee, Lanier Worldwide, Inc. All other issues are pretermitted.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.