# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2015 Session

## CHURCH OF THE FIRST BORN OF TENNESSEE, INC. v. TOM SLAGLE, ET AL.

**Appeal from the Chancery Court for Trousdale County**
No. 7196    Charles K. Smith, Chancellor

———————————————————

**No. M2014-01605-COA-R3-CV – Filed June 13, 2017**

———————————————————

A dispute among members of a church arose over control of the church. One group of members incorporated and then filed suit against individual members of the church seeking to quite title to certain real property. The parties filed cross-motions for summary judgment. In granting the individual church members' motion and denying the corporation's motion, the trial court found the church to be congregationally governed with a clear and established practice for handling real property transactions. We conclude that the corporation lacked standing to bring the action and that the corporation's case should be dismissed on that basis. Therefore, we reverse.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Case Remanded

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Larry L. Crain, Brentwood, Tennessee, and Joshua R. Denton and D. Hiatt Collins Nashville, Tennessee, for the appellant, Church of the First Born of Tennessee, Inc.

Joe M. Haynes, Goodlettsville, Tennessee; Keith Jordan, Nashville, Tennessee; and J. Thomas Smith, Franklin, Tennessee, for the appellees, Tom Slagle, Billy H. Ray, Jon James, Kelvin Gregory, Chester H. Cole, Earl B. Thompson, Gary Kelley, Roger Ray, Evelyn H. Cole, and Michael Spears.

# OPINION

## I.

### A. THE CHURCH OF THE FIRSTBORN

In 1933, Prator Donald "P.D." Hardin formed the Church of the Firstborn[1] (the "Church"), acting as its first elder/overseer. As elder/overseer, he served as the pastor and spiritual leader of the Church.

P.D. Hardin led the construction of the Church's first building in New Deal, Sumner County, Tennessee, in 1936. During that same time period, a Church congregation also met at Hartsville in Trousdale County. Later Church congregations would meet in Portland in Sumner County and Nashville in Davidson County. But, by the 1980s, the Church had only two locations: Hartsville in Trousdale County and White House in Robertson County.

Outside of spiritual matters, governance of the Church, an unincorporated association, could best be described as informal. Trustees held title to real property owned by the Church and executed documents on behalf of the Church. A board of deacons handled many of the business and temporal affairs of the Church. Historically, the elder/overseer selected deacons, but the manner for selection of trustees is a matter of dispute. Although P.D. Hardin allegedly drafted bylaws for the Church, the precise role of deacons and, to a lesser extent, the trustees in the Church is also disputed.

P.D. Hardin remained as elder/overseer of the Church until his death on September 19, 1983. Before his passing, he selected his nephew, Bob C. Hardin, to succeed him. During Bob Hardin's tenure as the elder/overseer, the Church began construction of a private Christian school on land in Robertson County adjoining the White House sanctuary. The school, which was named Dayspring Academy, opened in August 2006.

Bob Hardin died in 2008 without naming a successor elder/overseer. He had, however, ordained Robbie Kline to be the pastor of the Hartsville congregation and Roger Brewer to be the pastor of the White House congregation. At Bob Hardin's death, the board of deacons had seven members: John Edward Andrews, Mickey Andrews, Kelvin Gregory, Jon James, Billy H. Ray, Tom Slagle, and Earl B. "Brownie" Thompson.

---

[1] The Church is sometimes referred to as the "Church of the First Born." Testimony in the record indicates that the name originated from the *Bible*, in which the Apostle Paul wrote, "To the general assembly and church of the firstborn, which are written in heaven, and to God the Judge of all, and to the spirits of just men made perfect." *Hebrews* 12:23 (King James).

B. Church Schism

After Elder Bob Hardin's death in 2008, disagreements arose amongst the Church's members. The underlying basis for the disagreements is itself a matter of dispute. Some members claim that the dispute centers over "the Church's doctrinal position on the sacrament of baptism and its twenty-year long practice of using a Hebrew version of the name of God as a central tenant." Others trace the disagreements to Dayspring Academy and the "substantial and continuing costs of subsidizing" its operation.

Though the precise timeline is unclear, dissension grew, and the members chose sides. Certain members, including deacons, who formerly worshipped at White House moved their attendance to Hartsville. The minutes of the March 13, 2010, meeting of the deacons reflect the tensions between those attending services in White House and those attending services in Hartsville.

During the meeting, which was held in White House, the chairman of the deacons, Tom Slagle, complained that Church members who attended in Hartsville were being asked to leave the premises in White House. After commenting that the Church had no leader, he advocated for the "deacons to take charge" and "to put all this to rest." The minutes reflect that the deacons voted "to take control of all functions of the Church of the Firstborn."

Mr. Slagle sent a letter to Roger Brewer, pastor at White House, advising him of the vote of the deacons. The letter, dated March 13, 2010, stated that the deacons would assume control of the following functions of the Church, "just to name a few":

1. Security of the Church of the Firstborn, Dayspring Academy, and all property owned by Church of the Firstborn

2. Taping program

3. Official record of attendance and all official functions of the secretary of the Church of the Firstborn

4. Campground

5. All business functions of the Church of the Firstborn and Dayspring Academy

But the disagreements continued.

At the board of deacons meeting on Saturday, August 7, 2010, the deacons

3

discussed a meeting in Hartsville the previous Sunday. As relayed by the deacons, members worshipping in Hartsville expressed concerns about the Church's finances, the funding of Dayspring Academy, unmet needs in Hartsville, and their lack of input on spending. Some members wanted to separate the offerings from Hartsville and White House, and some objected to their offerings being used to fund Dayspring Academy. Concerns also included the divisions between White House and Hartsville and a rumor that the Church might sell the Hartsville sanctuary to raise revenue.

The deacons also discussed declining Church revenues and the differences among members of the Church. To address the financial concerns, the deacons debated cutting costs at or possibly closing Dayspring Academy. The minutes reflect that Mr. Slagle declared that "We will not save both; it is save the church or save the school." Another deacon indicated that the Church's problems were "spiritual," and some of the deacons suggested that the pastors, Robbie Kline in Hartsville and Roger Brewer in White House, needed to get together.

The same day as the deacons' meeting, Pastor Brewer circulated a three-point statement of faith and requested that it be signed to indicate assent to upholding the Church's "doctrine." Some versions of the statement of faith included the following sentence: "We do not and will not accept or fellowship any other plan of salvation or any other baptism formula." Deacons Ed and Mickey Andrews signed a version of the statement of faith that included the quoted sentence, but the remaining five deacons did not. Also among those failing to sign the statement of faith was the Church secretary and daughter of P.D. Hardin, Evelyn H. Cole.

The following Wednesday, Pastor Brewer gave a sermon in White House. The sermon addressed people who had "stop[ped] putting their money in the offering plate." In the sermon, Pastor Brewer also stated as follows: "This congregation will not — and I want you all to 'amen' me if you agree with me. This congregation will not step aside and allow Dayspring Academy's funding to stop. It won't happen."

A few days later, Mr. Slagle sent two letters on behalf of the board of deacons. The first letter, directed solely to Pastor Brewer, demanded that he stop circulating the statement of faith. In the letter, Mr. Slagle complained that a majority of the deacons had not seen the statement of faith before it was circulated. He also claimed to be in possession of "the original bylaws of the Church of the Firstborn written by Brother [P.D.] Hardin" and suggested that Pastor Brewer's statement of faith could constitute a violation of those bylaws.

The second letter, directed to Pastor Brewer and Pastor Kline, referred to "a crisis that affects all of us as members" and referenced the possibility of "dissolution." The letter advised that an attorney had been hired "to advise us through a mediation process that will reach an amicable resolution." The letter included a proposed "AGREEMENT

4

FOR MEDIATION AND ARBITRATION." If the mediation proved unsuccessful, the agreement committed the signatories to binding arbitration of the conflict.

Pastor Kline, along with Deacons Slagle, Ray, Thompson, Gregory, and James, signed the AGREEMENT FOR MEDIATION AND ARBITRATION. Pastor Brewer and Deacons Ed and Mickey Andrews did not.

Despite the disagreements, all seem to acknowledge November 21, 2010, as the date that the Church split. Prior to that date, Pastor Brewer decided that the Church's leadership could not include members that had not signed his statement of faith. So he nominated a new slate of deacons and a new Church secretary. On November 21, members attending in White House voted to "affirm" Pastor Brewer's nominees for board of deacons and Church secretary.

Also on November 21, and at least partially in response to the vote in White House, Mr. Slagle, who was by then attending services in Hartsville, presented the members there the bylaws purportedly written by P.D. Hardin. Members present signed a statement ratifying the bylaws, which were described as "the foundation of the Church of the Firstborn as it was established in its beginning."

C. CHURCH PROPERTY

"And it must follow, as the night the day,"[2] the split raises the question of control over the Church's property in Robertson and Trousdale Counties. A financial statement for the Church issued in 2008 showed the properties and improvements had a value in excess of $14 million. At least five distinct tracts of land[3] are titled in the names of trustees for the use and benefit of the Church.

In Robertson County, the White House sanctuary sits on approximately 17.6 acres. The property was acquired in May 1972 using funds raised by the Church's ladies auxiliary. The Dayspring Academy campus and a Church operated campground, known as Camp Le'Prat, sit on a larger tract of land, which was formerly known as the "Neal property."[4] Acquired in February 1969, P.D. and Lela Hardin, Chester and Evelyn Cole,

---

[2] WILLIAM SHAKESPEARE, HAMLET, act 1, sc. 3.

[3] We summarize and estimate the acreage of the real property currently held for the use and benefit of the Church because neither the record nor the parties' briefs provide a succinct description.

[4] Dayspring Academy sits on roughly 25 acres of the former Neal property, and Camp Le'Prat sits on approximately 87 acres adjacent to the school. While the campground was also created out of the Neal property, the Church expanded Camp Le'Prat with the acquisition of an addition 12.3 acres in March 1969.

5

Aubrey and Betty Gill, and Billy and Barbara Ray purchased the Neal property for $65,000. They then deeded the property to trustees for the use and benefit of the Church. The surviving grantors claim they retained a right of first refusal should the property ever be sold.[5]

Between 1973 and 1998, the Church acquired interests in several other significant tracts of land in Robertson County. The record is unclear as to how many of these properties in which the Church still retains an interest.

In Trousdale County, the Church has an interest in two lots: an improved lot of 3.542 acres, which includes a sanctuary, and an adjoining lot of 2.12 acres. The sellers of the property on which the sanctuary sits, David and Theresa Parker, placed two restrictions in the deed. First, the property was "to be used for church purposes or church charity purposes only." Second, the Parkers retained "the right of first refusal" if the property was ever sold.

## D. PROCEEDINGS BELOW

The question of control over the Church property led to the filing of two separate lawsuits, only one of which is the subject of this appeal.[6] On June 10, 2011, a newly formed, nonprofit religious corporation named "Church of the First Born of Tennessee" (the "Corporation") filed suit to quiet title in the Chancery Court of Trousdale County, Tennessee. As defendants, the complaint named Tom Slagle, Billy Ray, Jon James, Kelvin Gregory, Chester H. Cole, Earl B. Thompson, Gary Kelley, Roger Ray, Evelyn H. Cole, and Michael Spears (collectively, the "Defendants").[7]

Beyond seeking to quiet title to the Church properties in Trousdale County, the complaint sought a declaratory judgment determining the rightful owner of the properties, to eject the Defendants, damages for conversion of the Church's personalty, an

---

[5] Though the surviving grantors claim to have donated the Neal property to the Church, evidence in the record also indicates that the Church assumed the balance of the grantors' mortgage and/or paid $200,000 as consideration for the property.

[6] Also on appeal is the judgment of the Chancery Court of Robertson County, Tennessee, entered in *Slagle et al. v. The Church of the First Born of Tennessee et al.*, Case No. M2015-002970-COA-R3-CV.

[7] The named defendants include each of the deacons and the Church secretary that had failed to sign Pastor Brewer's statement of faith. The named defendants also include surviving trustees in whose names real property was titled along with "new" trustees elected post-split by members of the Church attending in Hartsville. An "Affidavit in Furtherance of Identification" executed by Evelyn Cole and recorded with the Office of the Register of Deeds for Robertson County, Tennessee, on March 7, 2011, described the election.

accounting, and injunctive relief.[8]  The Defendants filed a motion for summary judgment. The Defendants sought a judgment that the unincorporated association retained title to the dispute properties.  The Corporation responded by filing a motion for partial summary judgment.  The Corporation sought a judgment that the Church was congregational[9] and that a congregational vote was required to determine ownership of Church property.

On July 24, 2014, the trial court entered an order denying the Corporation's motion for partial summary judgment and granting the Defendant's motion for summary judgment.  The court found the Church to be congregationally governed with two places of worship, not a connectional or hierarchical church.  It concluded that the election held in White House to confirm Pastor Brewer's nominees for deacon was void because the method used was not consistent with past practice.  In this regard, the court found that the practice of the Church was for the elder/overseer to appoint deacons.  Thus, the court determined that the deacons serving before the November 21, 2010 election constituted the valid board of deacons of the Church until replaced by an elder/overseer.

The court further concluded that any actions taken by the board of deacons affirmed by the members in White House were void, including the formation of the Corporation.  As such, the Church was not incorporated.  Finally, the court held that any transfer of the Trousdale County properties required approval of two-thirds of the members attending in Hartsville.

## II.

On appeal, the Corporation raises several issues.  First, it argues that disputed issues of material fact precluded the grant of the Defendants' motion for summary judgment and that there was no established Church precedent regarding the control, purchase, or sale of real property.  Second, the lack of established precedent coupled with the finding that the Church was congregational required the court to order a membership-wide vote to resolve the dispute.  Third, the Corporation argues the trial court erred in ruling on matters not properly before it, such as determining the November 2010 election of deacons was void, how deacons must be appointed, or who constituted the valid deacons for the Church.  Fourth, the Corporation complains that the Defendants did not

---

[8] By agreement of the parties, the trial court dismissed without prejudice a claim for libel of title directed to Ms. Cole only.

[9] A congregational church is a church "that is strictly independent of other ecclesiastical association, and one that so far as church government is concerned, owes no fealty or obligation to any higher authority."  77 C.J.S. *Religious Societies* § 2, Westlaw (database updated May 2017) (footnote omitted).  "[I]n a 'congregational church,' the congregation is the highest authority."  *Id.* (footnote omitted); *see also Nance v. Busby*, 18 S.W. 874, 881 (Tenn. 1892) (Congregational and independent church "was a pure democracy.").

adequately state the grounds or basis for their motion for summary judgment. Finally, the Corporation argues that the court failed to state the legal grounds for some of its rulings.

The Defendants, who of course seek affirmance of the ruling below, reframe the issues for appeal. In support of the ruling, the Defendants argue, in part, that the Corporation is not affiliated with the Church and has no valid claim to the Church properties. As we perceive the issue, the Defendants question the Corporation's standing. Courts must consider questions of justiciability, such as standing, before reaching the merits of claims. *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013).

Standing is a judicially created doctrine that asks whether a party advancing a claim is "properly situated to prosecute the action." *Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). Courts "'may and properly should refuse to entertain an action at the instance of one whose rights have not been invaded or infringed.'" *Mayhew v. Wilder*, 46 S.W.3d 760, 767 (Tenn. Ct. App. 2001) (quoting 59 AM. JUR. 2D *Parties* § 30 (1987)). Constitutional standing, the issue in this case, requires the plaintiff to demonstrate (1) a distinct and palpable injury; (2) a causal connection between the alleged injury and the challenged conduct; and (3) that the injury can be redressed through a favorable decision of the court. *City of Memphis*, 414 S.W.3d at 98. A standing analysis focuses on the party, rather than the merits of the claim. *Metro. Air Research Testing Auth., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). Even so, the standing inquiry "often turns on the nature and source of the claim asserted." *Id.*

In actions such as this one, our supreme court has held a member of the church congregation has standing. *Nance v. Busby*, 18 S.W. 874, 877 (Tenn. 1892).[10] Courts in other jurisdictions have reached the same conclusion, reasoning that individual church members have standing as each member has a personal right in his or her place of worship. *See e.g.*, *Ashworth v. Brown*, 198 So. 135, 136 (Ala. 1940) (Suit over diversion of church property "may be brought . . . by church officials, or church members, or both."); *Justice v. Rollins*, 106 S.W.2d 140, 141 (Ky. 1937) (Remaining members of congregation could file suit.). Further, where the church is unincorporated, courts in other jurisdictions have permitted one or more members to sue on behalf of all members or allowed trustees holding title to the property to sue. 77 C.J.S. *Religious Societies* § 115, Westlaw (database updated May 2017); *see, e.g.*, *Hamner v. Carroll's Creek Baptist Church*, 51 So. 2d 164, 166 (Ala. 1951); *Hughes v. Grossman*, 201 P.2d 670, 673 (Kan. 1949); *Trett v. Lambeth*, 195 S.W.2d 524, 535 (Mo. Ct. App. 1946); *see also Ark. Annual Conference of AME Church, Inc. v. New Direction Praise & Worship Ctr., Inc.*, 291

---

[10] On the other hand, standing may be lost once membership ceases. *Nance*, 18 S.W. at 877; *see also* 77 C.J.S. *Religious Societies* § 115, Westlaw (database updated May 2017) ("Since the rights and beneficial interest of a member of a religious society in its property cease when he or she ceases to be a member, he or she no longer has standing to sue . . . .") (footnote omitted).

8

S.W.3d 562, 569 (Ark. 2009) (holding state and national religious organization had no right, title, or interest in church property and thus lacked standing to challenge conveyance of real property to local church and validity of deed).

Here, the plaintiff is not a member of the Church or a trustee in whose name Church property is titled, rather it is a nonprofit religious corporation formed after the Church split. According to its charter, which was filed with the Tennessee Secretary of State on January 24, 2011, Pastor Brewer and Deacon Ed Andrews possess authority to act on behalf of the Corporation pending the adoption of bylaws. Also according to the charter, the Corporation would be governed

> by the church bylaws as adopted and approved by the church congregation which shall embody the practices, doctrine, teachings and tradition of the church as carried out during the last 70 years of its existence, and as first demonstrated and taught by its founder Pastor Prader [sic] Hardin, and his successor Pastor Bob Hardin.

The Corporation's initial principal office is the same address as the White House sanctuary.

We conclude that the Corporation lacked standing to bring the claims asserted in its complaint. Each claim was predicated on an interest in the real or personal property located in Trousdale County. Although an unincorporated religious association, such as the Church, may incorporate, to do so and distribute all interests of the Church to the Corporation would have required the consent of all members of the Church. *See* 36 AM. JUR. 2D *Fraternal Orders* § 147, Westlaw (database updated May 2017). That did not occur in this case. But even if unanimous consent of the member of the Church was not required, more notice of the incorporation and transfer of property to the Corporation was required.

The United States District Court for the Western District of Virginia faced an analogous situation in *Bedford Genealogical Soc'y, Inc. v. Bedford Museum & Genealogical Library*, No. CIV.A. 6:09-CV-00060, 2010 WL 2038843 (W.D. Va. May 21, 2010). In *Bedford Genealogical Society*, the district court found that a corporation claiming to be a successor in interest to an unincorporated association had failed to notify all members of the association of the vote to incorporate or to obtain unanimous consent to incorporate. *Id*. at *4. Based on these facts, the court concluded that the association had not been incorporated. *Id*. As consequence, the corporation could not "be the successor in interest to the unincorporated association." *Id*.

As support for its conclusion, the court cited to "black-letter law" that a member of an association may not "'become a member of the corporation without his or her

9

knowledge or consent.'" *Id.* (quoting 7 C.J.S. *Associations* § 106 (2004)).[11] The practical consequence was that the unincorporated association still existed and that it retained its assets. As the court explained:

> [a]ccording to well-established precedent, "where an attempt to incorporate an existing unincorporated association, or to merge such association into a corporation, is ineffectual, such action does not affect the existence or property of the association." 7 Corpus Juris Secundum § 106 (2004); *see also Ozark County School Dist. R-V of Ozark County v. Lay*, 358 S.W.2d 77, 81 (Mo. Ct. App. 1962) (action of unidentified persons in organizing corporation under same name did not terminate or destroy independent continued existence of the unincorporated association and did not work transfer or conveyance to corporation of title to, or any interest in, association's property or assets); *Hope v. Alabama Lodge of Odd Fellows*, 103 So. 54 (Ala. 1925) (where incorporation is participated in and authorized by less than a majority, the legal title of properties remains in trust for the majority of membership, or in abeyance for the unincorporated association); *Great Council of Improved Order of Red Men of State of New Jersey*, 114 A. at 444 (where incorporation was ineffectual, title to the association's property remained in trust for the members of the association); *Schiller Commandery, No. 1, United Friends of Michigan v. Jaennichen*, 1A N.W. 458 (1898) (where the action to incorporate is not unanimous, property of the unincorporated association is not vested in the newly formed corporation).

*Id.* Because the association retained title to its property, the corporation lacked standing to assert a claim for infringement of the property, and the court dismissed the case. The same result is appropriate in the case before us.[12]

---

[11] We recognized that a Tennessee nonprofit corporation need not have members. Tenn. Code Ann. § 48-52-102(a)(8) (Supp. 2016).

[12] This case is distinguishable from *Adams v. Bethany Church*, 380 So. 2d 788 (Ala. 1980). In *Adams*, the Supreme Court of Alabama held that when an "association is incorporated the legal title [to property] will pass to the incorporated religious association." *Id.* at 790. The case does not discuss whether the incorporation was unanimously supported by the membership of the association. In addition, the association incorporated in order to rectify an unsuccessful attempt to hold title to property in the association's name rather than in the name of trustees. *Id.*

10

## III.

Plaintiff Church of the First Born of Tennessee lacked standing to bring this action. Therefore, we reverse the decision of the trial court and remand with instructions to dismiss the action.

_____
W. NEAL MCBRAYER, JUDGE